**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| *ex rel.* THERESA HILL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -v- | ) | No. 08 C 4540 |
| | ) | Honorable Judge Rebecca Pallmeyer |
| CITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S CONCISE RESPONSE TO DEFENDANT CITY OF CHICAGO'S**
**LOCAL RULE 56.1 STATEMENT OF FACTS IN SUPPORT OF ITS MOTION**
**FOR SUMMARY JUDGMENT**

NOW COMES the Plaintiff, United States of America ex rel. Theresa Hill, by and through her attorneys, Steven J. Seidman and Barry Spevack, of Monico, Pavich & Spevack, and for her Concise Response to Defendant City of Chicago's Local Rule 56.1 Statement of Facts states the following:

**A.      Jurisdiction and Venue**

1.      Agreed.  Jurisdiction is based upon the federal False Claims Act.

2.      Agreed.  Venue is proper as the Defendant is a municipal corporation within the judicial district.

**B.      The Complaint and the Parties in the Lawsuit**

3.      On August 11, 2008, Relator filed this action against the City. (Civil Docket for Case No. 08-4540 ("Docket") #1)

A:      Agreed.

4.      The City is a municipal corporation. (Tab A – Answer ¶10)

A:      Agreed.

5.      Relator was employed by the City, beginning in 2006. (Tab A – Answer ¶9; Tab B - Deposition of Theresa Hill ("Hill Dep.") pp. 11, 112)

A:      Agreed.

6.      The United States in a party to this action, but has declined to intervene. (Docket #2)

A:      Agreed.

**C.      The Events that Gave Rise to Relator's Complaint**

7.      Beginning in 2006 and into 2007, when Relator was an Assistant Commissioner in the City's Department of Human Resources, she alleges that she had been asked on various occasions by individuals within various City departments, including the Chicago Police Department ("CPD"), to sign a document titled "Equal Employment Opportunity Plan ('EEOP') Certification" on behalf of the City.  (Tab A – Answer ¶9; Tab B – Hill Dep. at 60, 64, 66, 120-21, 124-25)

A:      Agreed.  Theresa Hill had only been working for a short time as an Assistant Commissioner in the Workplace Compliance Unit of the City of Chicago's Department of Human Resources (DHR), when she was asked to contact Gail Woods from the Chicago Police Department (CPD) about signing off on a grant application that would have averred that the City had in effect an Equal Employment Opportunity/Affirmative Action plan as required by federal regulations in order to receive federal funding. (Ex. A, Deposition of Theresa Hill "Hill Dep." pp. 65-66, 118).

8.      When presented with the first EEOP Certification, Relator became aware of a City document titled "Equal Employment Opportunity/Affirmative Action Plan" dated

2005-2009, but she did not believe that that document satisfied the certification requirements. (Tab B – Hill Dep. at 122-23, 144, 177, ex. 11).

> A: Agreed. Apparently, Hill's immediate supervisor, Mark Devane, who was a Deputy Commission, had previously signed off on the CPD grants but he was unavailable. (Hill Dep. 65). Woods told Hill that the CPD's affirmative action plan was inactive and therefore CPD needed to use the City's until the CPD got its own plan back together. (Ex. A, Hill Dep. pp. 65, 69-71). In an email, Robert Keller, EEO Officer in DHR had previously described signing off on the plan as "standard operational procedure." (Ex. C., Deposition of Mark Devane "Devane Dep." p. 22).

9. Because Relator did not believe that the City met the certification requirements, on each occasion that she was presented with an EEOP Certification, she refused to sign the document, and she was never ordered or told that she had to sign any of the EEOP Certifications. (Tab B – Hill Dep. at 60, 126-27).

> A: Agreed. Before agreeing to sign, Hill decided to check on the City's plan. She obtained a copy of a purported plan, entitled Equal Employment Opportunity/Affirmative Action Plan (2005-2009), and then checked for evidence of meetings, investigations, personnel payroll information and other things to determine whether the plan had been implemented. (Ex. A, Hill Dep. pp. 113-14). In short order, she could see that the plan had never been implemented. (Ex. A, Hill Dep. p. 118). Hill refused to sign off on the grant certification.

10. Relator raised her concerns with the then-Commissioner of DHR, Jacqueline King, that she did not believe the City could sign the EEOP Certifications and that a

proper EEOP needed to be drafted, and Commissioner King "support[ed her] for that effort." (Tab B – Hill Dep. at 123-24, 127, 130-31, ex. 1)

        A:     Agreed.  In April 2007, Woods approached Hill a second time about signing a certification that the City had an effective affirmative action plan in place in order for the CPD to obtain a different federal grant.  Hill emailed her Commissioner, Jacqueline King, and advised her that she had been asked to sign off on an EEO certification form, which she understood to be a guaranty that the City had a working EEO policy plan, which presently they did not have. (Ex. B, Deposition of Jacqueline King "King Dep.", Deposition Exhibit "Ex." 13).  Hill told Commissioner King, therefore, that she could not sign off on the certification. (Ex B, King Dep. Ex. 13).

11.    After Relator raised her concerns about the signing of the EEOP Certifications, it was her understanding that no one was to be signing the EEOP Certifications until the City could ensure that it was compliance with 28 CFR 42.301 *et seq*, the federal regulations referenced in the EEOP Certification, and she notified any department that contacted her regarding EEOP Certifications of the same. (Tab B – Hill Dep. at 151, 167-68)

        A:     Agreed.  Hill came to King and told King that the City did not have a functioning EEO plan, King just told Hill to talk to the Law Department. (Ex. B, King Dep. p. 18).  King testified that she did not know if Hill's concerns were valid; somebody needed to look into it. (Ex. B, King Dep. p. 32).  But she denied Hill's claim that King agreed they had an affirmative action pan on paper only. (Ex. B, King Dep. p. 75).  She testified that Hill told her it was not functioning but King could not say whether it was functioning or not; she trusted what Hill told her. (Ex. B, King Dep. p. 75).

Hill contacted the Law Department and they eventually it became Hill's understanding that no one should be signing off of the certificates. (Ex. A, Hill Dep. p. 151). King testified that she did not recall any discussion or someone saying they should not sign off on the certifications. King remembers only telling Hill her "mantra, never sign anything you are not comfortable with." (Ex. B, King Dep. p. 77). On June 11, 2007, there is an exchange of emails involving Hill and Amy Kovalan of the Law Department regarding getting this thing started. (Ex. A, Hill Dep. p. 85). Jamia McDonald from the Mayor's Office emailed Hill that it might be best to do the work through the Law Department. (Ex. B, King Dep. p. 24). The first step would be completing the study and the next step to implement the plan. Hill sent a return email that a previous proposal to Brian Murphy could be implemented and they would not have to forfeit their grants. (Ex. A, Hill 87).

### D. The City of Chicago's Grant Management Process

12. Grant funds supply needed revenue to the City for vital services not paid for by local taxes or fees. (Tab C – Declaration of Rosalind Stevens ("Stevens Dec.") ¶3)

> A: Agreed.

13. The City is eligible for various grants from different governmental and non-governmental entities, and the City receives approximately $1.4 billion annually in grant funds. (Tab C – Stevens Dec. ¶3)

> A: Agreed.

14. On or about January 15, 1991, the Mayor of the City issued Executive Order 91-1 to establish a centralized system for processing and monitoring grant applications and expenditures submitted and received by the City through its operating departments and

agencies, and the policies and procedures established under Executive Order 91-1 remain in effect to date. (Tab C – Stevens Dec. ¶4, Attachment 1)

> A: Agreed.

15. The process set forth in Executive Order 91-1 requires that all grant applications be submitted by the head of the City department that is applying for the grant to the Office of Budget and Management ("OBM"), the Special Accounting Division of the Office of the City Comptroller, and the Department of Law for review and approval at least 10 business days prior to the grant submission deadline. (Tab C – Stevens Dec. ¶5, Attachment 1)

> A: Agreed.

16. Executive Order 91-1 further requires that each department submit the following: (a) the names, titles and contact information for those employees who are responsible for preparing the grant applications; (b) notification as to granting or denial of a grant; and (c) a chronology of the funding cycle for each grant received by that department. (Tab C – Stevens Dec. ¶5, Attachment 1)

> A: Agreed.

17. Since 2005, OBM has provided training to each department regarding the grant management process as policies and procedures are revised. (Tab C – Stevens Dec. ¶6)

> Agreed.

18. The OBM, Comptroller's Special Accounting Division, and Department of Law created the grant management process manual ("Grants Manual") to provide a better understanding to each City department of the grants universe and to ensure that the

Executive Order 91-1 process is followed correctly. (Tab C – Stevens Dec. ¶7, Attachment 2)

> A:    Agreed.

19.    The Grants Manual sets forth the primary roles of the involved departments; the department seeking the grant funds, in part, applies for all applicable grants and manages the grant process through the closeout of the grant, the Department of Law, in part, reviews any certifications and/or assurances required by the application and/or agreement, and the OBM, in part, reviews the grant applications to ensure guideline requirements are met. (Tab C – Stevens Dec. ¶8, Attachment 2, pp. 3-4)

> A:    Agreed.

20.    The Grants Manual also reiterates that the OBM, Department of Law and Comptroller's Special Accounting Division must approve the submission of each grant application. (Tab C – Stevens Dec. ¶9, p. 4)

> A:    Agreed.

> **E.    The City Departments Impacted by the Equal Employment Opportunity Plan Certification Requirement to Obtain Federal Grant Funds**

21.    The Chicago Police Department ("CPD") and Department of Family and Support Services ("DFSS")[1] follow Executive Order 91-1 when obtaining grant funding for their departments. (Tab D – Declaration of Larry Sachs ("Sachs Dec.") ¶5; Tab E – Declaration of Lorrie Walls ("Walls Dec.") ¶4)

> A:    Agreed.

---

[1]    During the relevant period, a number of City departments and agencies merged to form the department that is currently known as DFSS, including the Department of Human Services and Department of Children and Youth Services. (Tab E – Walls Dec. ¶1)

22.     CPD obtains between 25-30 grants per year from various federal and state agencies for a total amount of approximately $25-$30 million, and DFSS obtains between 60-71 grants per year from various federal and state agencies for a total amount of over $200 million.  (Tab D – Sachs Dec. ¶4; Tab E – Walls Dec. ¶3)

        A:      Agreed.

23.     The only grants obtained by the City or its departments or agencies that require a separate EEOP Certification as part of the application packet specifically certifying that the department/entity has formulated an EEOP in accordance with 28 C.F.R. §42.301 *et seq.* are those applications that request grant funding directly from the Illinois Criminal Justice Information Authority, and all grant funding opportunities made available by the Illinois Criminal Justice Information Authority originate from grant funding provided to the State of Illinois by the U.S. Department of Justice.  (Tab B - Hill Dep. p. 104-05, ex. 8, p. City 1002; Tab D – Sachs Dec. ¶6; Tab E – Walls Dec. ¶5; Tab F – Deposition of Torrick Ward ("Ward Dep.") p. 26)

        A:      Agreed.

**F.      The Chicago Police Department's Equal Employment Opportunity Plans**

24.     Since May of 2002, Robert Flores ("Flores") has been one of CPD's EEO Officers.  (Tab G – Declaration of Robert A. Flores ("Flores Dec.") ¶2)

        A:      Agreed.

25.     Historically, CPD has developed and maintained its own EEOP, relying upon the "Seven-Step Guide to the Design and Development of an Equal Employment Opportunity Plan," which was developed by the U.S. Department of Justice, Office of Civil Rights, Office of Justice Programs.  (Tab G – Flores Dec. ¶¶3-4, Attachment 1)

A:      Agreed.

26.     In early 2003, Flores updated CPD's then existing EEOP, which CPD submitted to the U.S. Department of Justice's Office of Civil Rights.  (Tab G – Flores Dec. ¶¶5-6, Attachment 2)

A:      Agreed.

27.     Shortly thereafter, Flores received a letter dated May 23, 2003 from the then-Acting Director of the Office of Civil Rights, Michael Alston indicating that the "Office of Civil Rights has reviewed and approved the Equal Employment Opportunity Plan (EEOP) which [CPD] submitted" and that the "approved plan is effective for two years from [May 23, 2003]."  (Tab G – Flores Dec. ¶7, Attachment 3)

A:      Agreed.

28.     In late 2004/early 2005, Flores updated CPD's then existing EEOP, which CPD submitted to the U.S. Department of Justice's Office of Civil Rights.  (Tab G – Flores Dec. ¶¶8-9, Attachment 4)

A:      Agreed.

29.     Shortly thereafter, Flores received a letter dated May 3, 2005 from the Director of the Office of Civil Rights, Michael Alston indicating that the "Office of Civil Rights has reviewed and approved the Equal Employment Opportunity Plan (EEOP) which [CPD] submitted" and that the "approved plan is effective for two years from [May 3, 2005]." (Tab G – Flores Dec. ¶10, Attachment 5)

A:      Agreed.

30.     In late 2006/early 2007, Flores updated CPD's then existing EEOP, which it submitted to the U.S. Department of Justice's Office of Civil Rights. (Tab G – Flores Dec. ¶¶11-12, Attachment 6)

        A:      Agreed.

31.     Flores then received a letter dated November 1, 2007 from the Director of the Office of Civil Rights, Michael Alston indicating that the "Office of Civil Rights has reviewed and conditionally approved the Equal Employment Opportunity Plan (EEOP) which [CPD] submitted" and that the "approved plan in effective for two years from [November 1, 2007]." (Tab G – Flores Dec. ¶13, Attachment 7)

        A:      Agreed.

32.     Throughout Flores' tenure as the EEO Officer, he has maintained in his office a copy of the current and approved EEOP so that it is available for review by the public, employees, officials from the Illinois Criminal Justice Information Authority, officials from the U.S. Department of Justice, or anyone else that requests a copy for review, and throughout his tenure, Flores' office has been located in CPD's Office of Legal Affairs at 3510 S. Michigan Avenue, Chicago, Illinois, and the General Counsel's Office is also located within the Office of Legal Affairs. (Tab G – Flores Dec. ¶¶14-15)

        A:      Agreed.

33.     In addition to creating and seeking Department of Justice approval of CPD's EEOPs, another one of Flores' job responsibilities as the EEO Officer is to ensure that CPD is implementing the goals and objectives identified in each EEOP, which requires him to work with the members of CPD to recruit, train, and ensure equal employment opportunities for all within CPD. (Tab G – Flores Dec. ¶16)

A:    Agreed.

**G.    The City of Chicago's Equal Employment Opportunity Plans**

34.    Unlike CPD, DFSS never developed its own EEOP, instead it relies upon the equal employment opportunity policies promulgated on behalf of the City by its Department of Human Resources or Office of Compliance.  (Tab H – Declaration of Loisteen Woods Walker ("Woods Dec.") ¶9)

A:    Agreed.

35.    From 2005 to 2009, the City's Department of Human Resources had a plan place [sic] called "Equal Employment Opportunity/Affirmative Action Plan" that was intended to "establish specific policies and procedures to promote equal employment opportunities for minorities and women in the workforce of the City."  (Tab F – Ward Dep. pp. 97, ex. 10; Tab H – Woods Dec. ¶9)

A:    Denied.  While the City may have had a physical plan called "Equal Employment Opportunity/Affirmative Action Plan" it was not functional or implemented. The purported plan made the Commissioner of Personnel responsible for coordinating policy implementation for the plan and to serve as Chair of the Equal Employment Opportunity/Affirmative Action Advisory Council, along with providing a list of specific responsibilities and directives. (Ex. A, King Dep., Ex. 12).  In fact, the office of "Commissioner of Personnel" did not even exist anymore: in 2000 the Department of Personnel had become the Department of Human Resources, but no one bothered to amend the point in the later plans. (Ex. A, King Dep. p. 65; Ex. C., Devane Dep. p. 18). The Council was supposed to be made up of representatives from the Department of Personnel, Executive Director Commission on Human Relations, Mayor's Office for People with Disabilities, and the Department of Law, and to serve the Commissioner of

Personnel/Human Resources in an advisory capacity. (Ex. A, King Dep., Ex. 9, 11). Yet Commissioner King, though the person purportedly responsible to implement and monitor the program and act as Chair of the Council, when asked whether she was aware whether or not the City has a functioning EEO plan, responded, "I can't say I was aware or not. I am not familiar with it. I can't answer it yes or no. I am not familiar with the actual plans." (Ex. A, King Dep. pp. 13, 16-17). King said she did not recall seeing anything like the plan before, or even seeing a similar document, even though it had her name on it (apparently cut and pasted, because it wrongly identified her of course as Commissioner of Personnel). (Ex. A, King Dep., Ex. 11). King explained that back then Devane was the lawyer who was the Deputy Commissioner and they operated independently to make sure they implemented the rules. "I mean, they could have done this on their own without me. But I don't recall this." (Ex. A, King Dep. p. 54).

36.     By January 1, 2008, the City's Office of Compliance had also created a document on behalf of the City called the EEOP Short Form, which was effective for a two year period through December 31, 2009. (Tab F – Ward Dep. pp. 12-13, 17, 21, 26, 94, 101, ex. 1)

        A:     Agreed. However prior to January 2008 the City did not have a functioning EEO/AA plan. (Ex. B, Hill Dep. p. 155).

37.     The then-Deputy Commissioner in the City's Office of Compliance, Torrick Ward, maintained a copy of the City's January 1, 2008 EEOP in his office located at 333 S. State Street in Chicago, Illinois. (Tab F – Ward Dep. pp. 16, 86-89, 101-02, ex. 1)

        A:     Agreed. However prior to January 1, 2008 there was no functioning plan in place. (Ex. B, Hill Dep. p. 155)

**H.     EEOP Certifications Contained in Grant Application Packets for Chicago Police Department Grants**

38.    The division responsible for obtaining grant funds for CPD within CPD is its Research and Development Division, and, from March 2007 to the present, Larry Sachs has been the Director of CPD's Research and Development Division, and previously, from October 2004 to March 2007, he had been a Grants Research Specialist.  (Tab D – Sachs Dec. ¶¶1, 3)

        A:     Agreed.

39.    When questions have arisen within CPD about the EEOP Certification requirements, Sachs has been one of the primary individuals responsible for reaching out to the U.S. Department of Justice or Illinois Criminal Justice Information Authority for guidance.  (Tab D – Sachs Dec. ¶7)

        A:     Agreed.

40.    Had Sachs known that any of the EEOP Certifications were signed based on incorrect information, the certification at issue would not have been submitted in the grant application packet by his division.  (Tab D – Sachs Dec. ¶9)

        A:     Agreed.

41.    It has been Sachs' consistent understanding from communications with officials from the U.S. Department of Justice that if an EEOP has expired or a new EEOP has not yet been approved that CPD may continue to submit grant applications to the U.S. Department of Justice and to receive U.S. Department of Justice grant awards, and that though it is within the discretion of the grantor to delay a grantee's access to the grant funds until the EEOP is approved, CPD has never experienced such a delay in accessing U.S. Department of Justice grant funds.  (Tab D – Sachs Dec. ¶7)

A:     Agreed.

42.     Up to August 11, 2008, there have been eleven instances where CPD's Research and Development Division submitted EEOP Certification(s) along with its grant applications, and, in each of the eleven instances where EEOP Certifications were submitted, CPD obtained the requested grant funds from the Illinois Criminal Justice Information Authority and used these funds in accordance with the grant requests. (Tab D – Sachs Dec. ¶¶8, 10)

A:     Agreed.

**1.         Grant Number 601007**

43.     In 2004, CPD submitted two EEOP Certifications for Grant Number 601007 in the amount of $173,333 for domestic violence law enforcement; on August 5, 2004, the then-Superintendent of Police, Philip J. Cline, signed one of the EEOP Certifications and the then-Comptroller, Tariq Malhance, signed the other EEOP Certification, both certifying that CPD had "formulated an Equal Employment Opportunity Plan in accordance with 28 CFR 42.301, et seq., subpart E, that was signed into effect within the past two years by the proper authority and that it is available for review" at the "Chicago Police Department, Office of Legal Affairs, at 3510 S. Michigan Avenue, Chicago, Illinois 60653." (Tab D – Sachs Dec. ¶8(a), Attachment 2)

A:     Agreed.

**2.         Grant Number 600207**

44.     In 2005, CPD submitted two EEOP Certifications for Grant Number 600207 in the amount of $37,820 for domestic violence law enforcement; on January 21, 2005, the then-Superintendent of Police, Philip J. Cline, signed one of the EEOP Certifications and the then-Comptroller, Tariq Malhance, signed the other EEOP Certification, both

certifying that CPD had "formulated an Equal Employment Opportunity Plan in accordance with 28 CFR 42.301, et seq., subpart E, that was signed into effect within the past two years by the proper authority and that it is available for review" at the "Chicago Police Department, Office of Legal Affairs, at 3510 S. Michigan Avenue, Chicago, Illinois 60653." (Tab D – Sachs Dec. ¶8(b), Attachment 3)

A:     Agreed.

### 3.     Grant Number 602007

45.     In 2005, CPD submitted two EEOP Certifications for Grant Number 602007 in the amount of $130,000 for domestic violence law enforcement; on September 29, 2005, the then-Superintendent of Police, Philip J. Cline, signed one of the EEOP Certifications, certifying that the CPD had "formulated an Equal Employment Opportunity Plan in accordance with 28 CFR 42.301, et seq., subpart E, that was signed into effect within the past two years by the proper authority and that it is available for review" at the "Chicago Police Department, Office of Legal Affairs, at 3510 S. Michigan Avenue, Chicago, Illinois 60653." (Tab D – Sachs Dec. ¶8(c), Attachment 4)

A:     Agreed.

46.     On October 12, 2005, the second EEOP Certification was signed by the then-Comptroller, Tariq Malhance, certifying that "City of Chicago has formulated an Equal Employment Opportunity Plan in accordance with 28 CFR 42.301, et seq., subpart E, that was signed into effect within the past two years by the proper authority and that it is available for review" at the "Department of Personnel at 333 S. State Street, Suite 330, Chicago, Illinois 60604." (Tab D – Sachs Dec. ¶8(c), Attachment 4; Tab I - Declaration of Tariq Malhance ("Malhance Dec.") ¶¶4-5, Attachment 1)

A:     Agreed.

47.     At the time, Malhance had been aware that the Department of Personnel, which had a location at 333 S. State St., Suite 330, Chicago, Illinois 60604, had developed an Equal Employment Opportunity/Affirmative Action Plan that he believed complied with federal requirements, and had he known at the time of signing the certification form that the Equal Employment Opportunity/Affirmative Action Plan might not satisfy all of the requirements, Malhance would not have signed the certification, and he had no intention of submitted an inaccurate or false certification.  (Tab I - Malhance Dec. ¶¶6-10)

A:      Agreed.  However, it is Relator's contention that it is not a question of the Plan satisfying all requirements but rather the Plan was not fully implemented to satisfy all of the EEO/AA requirements under the law.

**4.        Grant Number 403800**

48.     In 2006, CPD submitted two EEOP Certifications for Grant Number 403800 in the amount of $150,000 for in-car cameras; on April 17, 2006 and April 21, 2006, the then-Superintendent of Police, Philip J. Cline, signed one of the EEOP Certifications and the then-Acting Comptroller, Steven Lux, signed the other EEOP Certification, respectively, both certifying that the Chicago Police Department had "formulated an Equal Employment Opportunity Plan in accordance with 28 CFR 42.301, et seq., subpart E, that was signed into effect within the past two years by the proper authority and that it is available for review" at the "Chicago Police Department, Office of Legal Affairs, at 3510 S. Michigan Avenue, Chicago, Illinois 60653."   (Tab D – Sachs Dec. ¶8(d), Attachment 5)

A:      Agreed.

**5.        Grant Number 503026**

49.     In 2006, CPD submitted one EEOP Certification for Grant Number 503026 in the amount of $1,661,506 for the Juvenile Accountability Incentive Block Grant Program; on June 19, 2006, the then-Superintendent of Police, Philip J. Cline, signed the EEOP Certification, certifying that the Chicago Police Department had "formulated an Equal Employment Opportunity Plan in accordance with 28 CFR 42.301, et seq., subpart E, that was signed into effect within the past two years by the proper authority and that it is available for review" at the "General Counsel, Chicago Police Department, at 3510 S. Michigan Avenue, Chicago, Illinois 60653." (Tab D – Sachs Dec. ¶8(e), Attachment 6)

A:     Agreed.

**6.        Grant Number 104052**

50.     In 2006, CPD submitted two EEOP Certifications for Grant Number 104052 in the amount of $500,000 for Project Safe Neighborhoods; on January 26, 2006, the then-Superintendent of Police, Philip J. Cline, signed one of the EEOP Certifications and the then-Acting Comptroller, Stephen C. Hughes, signed the other EEOP Certification, both certifying that the Chicago Police Department had "formulated an Equal Employment Opportunity Plan in accordance with 28 CFR 42.301, et seq., subpart E, that was signed into effect within the past two years by the proper authority and that it is available for review" at the "Chicago Police Department, Office of Legal Affairs, at 3510 S. Michigan Avenue, Chicago, Illinois 60653." (Tab D – Sachs Dec. ¶8(f), Attachment 7)

A:     Agreed.

**7.        Grant Number 602107**

51.     In 2006, CPD submitted two EEOP Certifications for Grant Number 602107 in the amount of $130,000 for domestic violence law enforcement; the then-Superintendent of Police, Philip J. Cline, signed one of the EEOP Certifications, certifying that the

Chicago Police Department had "formulated an Equal Employment Opportunity Plan in accordance with 28 CFR 42.301, et seq., subpart E, that was signed into effect within the past two years by the proper authority and that it is available for review" at the "Chicago Police Department, Office of Legal Affairs, at 3510 S. Michigan Avenue, Chicago, Illinois 60653." (Tab D – Sachs Dec. ¶8(g), Attachment 8)

    A:    Agreed.

52.    On August 24, 2006, the second EEOP Certification was contained [sic] the signature of then-Director of Compliance for the Department of Human Resources, Mark Devane, certifying that "City of Chicago has formulated an Equal Employment Opportunity Plan in accordance with 28 CFR 42.301, et seq., subpart E, that was signed into effect within the past two years by the proper authority and that it is available for review" at the "Department of Human Resources, 333 S. State Street, Suite 330." (Tab D – Sachs Dec. ¶8(g), Attachment 8)

    A:    Agreed, although Devane does not recall executing the Certification. (Ex. C, Devan Dep. p. 19).

53.    Devane does not recall signing any EEOP Certifications (*see* Paragraphs 52, 55, 71), however, he denies ever representing to any government entity that the City was compliant with its EEO obligations when he in fact knew that the City was not compliant; he denies having ever made any representations to any government entity with the intent to defraud that entity; he denies ever making any representations to any government entity that he knew to be false; and he denies having knowledge of any City employee, including himself, knowingly misrepresenting the facts to the federal government in order to obtain grant funds on behalf of the City. (Tab J - Devane Dep. pp. 61-65)

A:    Agreed.

54.    When Devane worked in DHR, he had been aware that DHR's Workplace Compliance Division was located at 333 S. State St., Suite 330, Chicago, Illinois 60604. (Tab J - Devane Dep. pp. 39-40)

A:    Agreed.

**8.    Grant Number 504026**

55.    In 2007, CPD submitted one EEOP Certification for Grant Number 504026 in the amount of $160,204 for the Juvenile Accountability Incentive Block Grant Program; on February 28, 2007, the EEOP Certification was signed by a then Deputy Commissioner in the Department Human Resources, Mark Devane, certifying that "City of Chicago has formulated an Equal Employment Opportunity Plan in accordance with 28 CFR 42.301, et seq., subpart E, that was signed into effect within the past two years by the proper authority and that it is available for review" at the "Workforce Compliance Office, 333 S. State Street, Suite 330;" however, Devane has no independent recollection of signing the EEOP Certification. (Tab D – Sachs Dec. ¶8(h), Attachment 9; Tab J - Devane Dep. pp. 26-28, exs. 2, 4)

A:    Agreed. Devane testified that he did not have any recollection of signing certifications, and as to the concept of an Equal Employment Opportunity/Affirmative Action Plan, he testified "I don't know what an EEO AA plan is …." (Ex. C., Devane Dep. p. 19).

**9.    Grant Number 403703**

56.    In 2007, CPD submitted one EEOP Certification for Grant Number 403703 in the amount of $105,113 for the Sharing CPD CLEAR Gang Application Program; on June

19, 2006, the then-Superintendent of Police, Philip J. Cline, signed the EEOP Certification, certifying that the Chicago Police Department had "formulated an Equal Employment Opportunity Plan in accordance with 28 CFR 42.301, et seq., subpart E, that was signed into effect within the past two years by the proper authority and that it is available for review" at the "General Counsel, Chicago Police Department, at 3510 S. Michigan Avenue, Chicago, Illinois 60653." (Tab D – Sachs Dec. ¶8(i), Attachment 10)

A:     Agreed.

**10.          Grant Number 106052**

57.     In 2008, CPD submitted two EEOP Certifications for Grant Number 106052 in the amount of $310,000 for Project Safe Neighborhoods; on January 18, 2008, the then-Interim Superintendent of Police, Dana V. Starks, signed one of the EEOP Certifications, certifying that the Chicago Police Department had "formulated an Equal Employment Opportunity Plan in accordance with 28 CFR 42.301, et seq., subpart E, that was signed into effect within the past two years by the proper authority and that it is available for review" at the "Chicago Police Department, Office of Legal Affairs, at 3510 S. Michigan Avenue, Chicago, Illinois 60653."  (Tab D – Sachs Dec. ¶8(j), Attachment 11)

A:     Agreed.

58.     On February 26, 2008, the other EEOP Certification contained the signature of the then-Executive Director of the Office of Compliance, Anthony Boswell, certifying that the City of Chicago had "formulated an Equal Employment Opportunity Plan in accordance with 28 CFR 42.301, et seq., subpart E, that was signed into effect within the past two years by the proper authority and that it is available for review" at the Office of Compliance at 333 S. State Street, Chicago, Illinois 60604, which was where the Office of Compliance was located at the time and where Torrick Ward maintained a copy of the

City's EEOP effective January 1, 2008. (Tab D – Sachs Dec. ¶8(j), Attachment 11; Tab F - Ward Dep. pp. 16, 85-89, ex. 1)

    A:    Agreed.

    **11.**        **Grant Number 505026**

59.    In 2008, CPD submitted one EEOP Certification for Grant Number 505026 in the amount of $200,414 for the Juvenile Accountability Incentive Block Grant Program; on June 11, 2008, the then-Deputy Commissioner of the Office of Compliance, Torrick Ward, signed the EEOP Certification, certifying that the City of Chicago had "formulated an Equal Employment Opportunity Plan in accordance with 28 CFR 42.301, et seq., subpart E, that was signed into effect within the past two years by the proper authority and that it is available for review" at the Office of Compliance at 333 S. State Street, Chicago, Illinois 60604, which was where the Office of Compliance was located at the time and where Torrick Ward maintained a copy of the City's EEOP effective January 1, 2008. (Tab D – Sachs Dec. ¶8(k), Attachment 12; Tab F - Ward Dep. pp. 16, 85-89, 101-02, ex. 1, group ex. 6 at City 1105)

    A:    Agreed.

    **I.**    **EEOP Certifications Contained in Grant Application Packets for Department of Family and Support Services Grants**

60.    The division responsible for obtaining grant funds for DFSS within DFSS is its Policy, Advocacy and Grants Division, and, from 2002 to the present, Lorrie Walls has been the Fiscal Administrator of DFSS's Policy, Advocacy and Grants Division. (Tab E – Walls Dec. ¶¶1-2.)

    A:    Agreed.

61.     Up to August 11, 2008, there have been four instances where DFSS's Policy, Advocacy and Grants Division submitted EEOP Certification(s) along with its grant applications, and in each of the four instances, DFSS obtained the requested grant funds and used these funds in accordance with the grant requests.  (Tab E – Walls Dec. ¶¶6-7)

        A:      Agreed.

        **1.            Grant Number 205289**

62.     In 2006, the Department of Human Services ("DHS") submitted two EEOP Certifications for Grant Number 205289 in the amount of $235,018 for victims' assistance funding; on June 9, 2006, DHS's Director of Administration, Loisteen Woods Walker, signed an EEOP Certification, certifying that DHS had "formulated an EEOP in accordance with 28 CFR §42.301, *et seq*., subpart E" and that the "EEOP is on file in the office of Chicago Department of Human Services, Office of Personnel" for review at "1615 West Chicago Avenue, 3rd Floor West, Chicago, Illinois 60622." (Tab E – Walls Dec. ¶6(a), Attachment 2; Tab H - Woods Dec. ¶4, Attachment 1)

        A:      Agreed.

63.     For each of the EEOP Certifications signed by Woods (*see* Paragraphs 62, 66-68), she had been aware that the City's Department of Personnel/Department of Human Resources had created a document titled "Equal Employment Opportunity/Affirmative Action Plan," she had received a copy of the Equal Employment Opportunity/Affirmative Action Plan, and she maintained a copy of the Equal Employment Opportunity/Affirmative Action Plan in her office for review, which was located at 1615 West Chicago Avenue, 3rd Floor West, Chicago, Illinois 60622. (Tab H - Woods Dec. ¶¶9-14, Attachments 1-4)

        A:      Agreed.

64.   For each one of the four EEOP Certifications signed by Woods, it was her good faith understanding and belief that the Equal Employment Opportunity/Affirmative Action Plan satisfied the federal requirements for her to sign the certifications, and had she known that the Equal Employment Opportunity/Affirmative Action Plan might not satisfy all of the requirements under the federal regulations referenced in the certification, she would have never signed the certifications, because she had no intention of certifying inaccurate or false information.  (Tab H - Woods Dec. ¶¶9-14, Attachments 1-4)

       A:      Agreed.

65.   The second EEOC Certification was signed on June 12, 2006 by then-Commissioner of DHS, Sheryl McGill, certifying that DHS had "formulated an EEOP in accordance with 28 CFR §42.301, *et seq*., subpart E" and that the "EEOP is on file in the office of Chicago Department of Human Services, Office of Personnel" for review at "1615 West Chicago Avenue, 3rd Floor West, Chicago, Illinois 60622, which is where Woods' office was located." (Tab E – Walls Dec. ¶6(a), Attachment 2; Tab H – Woods Dec. ¶¶8, 12; Tab L – Declaration of Sheryl C. McGill ("McGill Dec.") ¶¶1, 4-5)

       A:      Agreed.

66.   At the time, McGill had been aware that the Department of Human Resources had developed an Equal Employment Opportunity/Affirmative Action Plan that she believed complied with federal requirements, and had she known at the time of signing the certification form that the Equal Employment Opportunity/Affirmative Action Plan might not satisfy all of the requirements, McGill would not have signed the certification, and she had no intention of submitted an inaccurate or false certification.  (Tab L - McGill Dec. ¶¶6-9, Attachment 2)

A:     Agreed.

**2.          Grant Number 206289**

67.     In 2007, the Department of Human Services submitted one EEOP Certification for Grant Number 206289 in the amount of $244,419 for services to victims of domestic violence; on April 11, 2007, DHS's Director of Administration, Loisteen Woods Walker, signed an EEOP Certification, certifying that DHS had "formulated an EEOP in accordance with 28 CFR §42.301, *et seq*., subpart E" and that the "EEOP is on file in the office of Chicago Department of Human Services, Office of Personnel" for review at "1615 West Chicago Avenue, 3rd Floor West, Chicago, Illinois 60622." (Tab E – Walls Dec. ¶6(b), Attachment 3; Tab H - Woods Dec. ¶5, Attachment 2)

A:     Agreed.

**3.          Grant Number 205389**

68.     In 2007, the Department of Human Services submitted one EEOP Certification, a true and correct copy of which is attached hereto as Attachment 6, for Grant Number 205389 in the amount of $61,700 for services to victims of domestic violence; on July 30, 2007, DHS's Director of Administration, Loisteen Woods Walker, signed an EEOP Certification, certifying that DHS had "formulated an EEOP in accordance with 28 CFR §42.301, *et seq*., subpart E" and that the "EEOP is on file in the office of Chicago Department of Human Services, Office of Personnel" for review at "1615 West Chicago Avenue, 3rd Floor West, Chicago, Illinois 60622.".   (Tab E – Walls Dec. ¶6(c), Attachment 4; Tab H - Woods Dec. ¶6, Attachment 3)

A:     Agreed.

**4.          Grant Number 206389**

69.     In 2008, the Department of Human Services submitted one EEOP Certification for Grant Number 206389 in the amount of $122,210 for services to victims of domestic violence; on February 11, 2008, DHS's Director of Administration, Loisteen Woods Walker, signed an EEOP Certification, certifying that DHS had "formulated an EEOP in accordance with 28 CFR §42.301, *et seq.*, subpart E" and that the "EEOP is on file in the office of Chicago Department of Human Services, Office of Personnel" for review at "1615 West Chicago Avenue, 3rd Floor West, Chicago, Illinois 60622."  (Tab E – Walls Dec. ¶6(d), Attachment 5; Tab H - Woods Dec. ¶7, Attachment 4)

        A:      Agreed.

        **J.      The EEOP Certifications for Children and Youth Services Grants**

        **1.      Grant Number 2006-JU-FX-K012**

70.     Former Department of Children and Youth Services ("CYS") Commissioner Mary Ellen Caron's ("Caron") signature appears on a 2006 EEOP Certification related to Grant Number 2006-JU-FX-K012 in the amount of $400,000 for a grant titled Mentoring for Systems Involved Youth certifying that CYS had "formulated an EEOP in accordance with 28 CFR §42.301, *et seq.*, subpart E" and that the "EEOP is on file in the office of Human Resources at 121 N. LaSalle St. Chicago, IL 60602" for review.  (Tab K - Declaration of Mary Ellen Caron ("Caron Dec.") ¶¶2, 5-6, Attachment 1)

        A:      Agreed.

71.     At the time, Caron had been aware that the Department of Human Resources, which was located at 121 N. LaSalle St., Chicago, Illinois 60602, had developed an Equal Employment Opportunity/Affirmative Action Plan that she believed complied with federal requirements, and had she known at the time of signing the certification form that the Equal Employment Opportunity/Affirmative Action Plan might not satisfy all of the

requirements, Caron would not have signed the certification, and she had no intention of submitted an inaccurate or false certification. (Tab K - Caron Dec. ¶¶6-10, Attachment 2)

       A:    Agreed. However,

       **2.**    **Grant Number 105072**

72. Former Deputy Commissioner of DHR Mark Devane's signature appears on another EEOP Certification related to Grant Number 105072 in the amount of $62,865 for Project Safe Neighborhoods certifying that "City of Chicago has formulated an Equal Employment Opportunity Plan in accordance with 28 CFR 42.301, et seq., subpart E, that was signed into effect within the past two years by the proper authority and that it is available for review" at the "Department of Human Resources, 333 S. State Street, Suite 330;" Devane recognizes the handwriting on the certification to be his signature, however, he has no independent recollection of signing the EEOP Certification. (Tab J – Devane Dep. pp. 46-49 and City 1681)

       A:    Agreed.

## ADDITIONAL FACTS REQUIRING THE DENIAL OF SUMMARY JUDGMENT

73. Devane, an attorney, was a Deputy Commissioner of workforce compliance at the time he executed the Certifications, although he claimed to have no recollection of having signed the Certifications. (Ex. C, Devane Dep. pp. 7, 9, 18-21, 44).

74. Devane did not remember whether there was an EEO plan on file at the Department of Human Resources. (Ex. C, Devane Dep. p. 22).

75.     As to whether there was a plan, Devane relied upon information provided to him by Robert Keller. (Ex. C., Devane Dep. p. 46).

76.     Devane did not recall reading 28 CFR 42.301. (Ex. C., Devane Dep. p. 48).

77.     Devane was not familiar with an entity called the EEO Affirmative Action Council or, if it existed, what it intended to implement or monitor. (Ex. C., Devane Dep. p. 53).

78.     Devane never heard of an Executive Diversity Committee. (Ex. C., Devane Dep. p. 56).

79.     Devane did not recall being a Diversity Officer. King suggested that Devane may have been the Diversity Officer. (Ex. C., Devane Dep. p. 56; Ex. B., King Dep. p. 54).

80.     Devane only certified that a plan existed, not that it functioned. (Ex. C., Devane Dep. p. 54).

81.     Devane stated: "[t]here is a plan.  As I read this, it invites whoever wishes to come and look at the plan.  They may want to see if it complies with the full letter of the referenced regulation, but I'm not certifying that it does, but there is a plan and, please, take a look if you are interested." (Ex. C., Devane Dep. pp. 54-55).

82.     Torrick Ward, while at the City of Chicago, was a Deputy Director of Compliance.  He saw Certifications in this role.(Ex. D., Deposition of Torrick Ward "Ward Dep." pp. 6, 11, 85-89).

83.     Ward asserted the attorney-client privilege when asked whether when he executed the Certifications, he knew the City of Chicago was in compliance.(Ex. D., Ward Dep. pp. 11-12).

84.      Ward testified that he knew the City of Chicago had a plan "in place" because he "looked at it". (Ex. D., Ward Dep. pp. 12-13).

85.     When asked if he followed up to find out whether the Plan was actually implemented, again he asserted the attorney-client privilege. (Ex. D., Ward Dep. pp. 13-14).

86.     Ward also asserted the attorney-client privilege with respect to whether he checked to see if departments were complying with affirmative action plans. (Ex. D., pp. 17-20).

87.     Ward testified that the City of Chicago had an Executive Diversity Committee, but he could not recall when that was. (Ex. D., Ward Dep. pp. 68-69).

88.     Ward did not know how often the Executive Diversity Committee met or the location of its meetings. (Ex. D., Ward Dep. pp. 71-72).

89.     Ward could not recall any topics of discussion other than generally "issues regarding equal opportunity and diversity in the City of Chicago. (Ex. D., Ward Dep. pp. 71-72).

90.     Ward was not sure whether there was a need even to have "an implemented functional EEO/AA Plan," but he could not elaborate because of attorney-client privilege. (Ex. D., Ward Dep. pp. 79-80).

91.     Lorrie Walls, a grant specialist with the Department of Family and Support Services (DFSS), testified that each City department prepares its own grant requests specific to its own role and function. (Ex. E., Deposition of Lorrie Walls "Walls Dep." pp. 9, 11). From there the grant request goes to the City's Law Department. (Ex. E., Walls Dep. pp. 9-10, 26). Afterwards, it is submitted to the Office of Business Management, where it its reviewed prior to submission to the funder. (Ex. E., Walls Dep.pp. 9-10, 26). Each department has to give its approval. (Ex. E., Walls Dep. p. 28). The application is then returned to the department that initially submitted it. (Ex. E., Walls Dep. p. 10). DFSS obtains about 60-71 grants per year. (Ex. E., Walls Dep. p. 18). As to who signs off on the certifications, Walls testified that it would be someone on the managerial staff of the department. (Ex. E., Walls Dep. pp. 40-41).

92.     Jaqueline King was Commissioner of the Department of Human Resources. (Ex. B., Kind Dep. p. 8).

93.      The purported plan provided for a Director of Affirmative Action to supervise the implementation of the plan and perform other designated duties. (Ex. B., King Dep., Ex. 11). King testified that she could not recall anyone occupying that title either before or after she was Commissioner at DHR, but she "assume[d]" the function was performed somewhere in compliance. (Ex. B., King Dep., Ex. 11). King testified that she could not recall anyone occupying that title either before or after she was Commissioner at DHR, but she "assume[d]" the function was performed somewhere in compliance. (Ex. B., King Dep. p. 63). Asked whether she was aware of an Affirmative Action Advisory Council at the time she was Commissioner of DHR, King testified that she could not recall. (Ex. B., King Dep. p. 64). Even after reviewing the "Equal Employment Opportunity/Affirmative

Action Plan," King testified that it did not refresh her recollection as to whether there was an Affirmative Action Advisory Council. (Ex. B., King Dep. p. 65).

94.     King testified that the no longer recalls what was meant by "implementing the program." (Ex. B., King Dep. p. 27). Nor did she recall what McDonald meant by asking them to explore having the required work done. (Ex. B., King Dep. p. 28). She did not recall what was meant by a "study" or what they meant when they talked about "execut[ing] the plan." (Ex. B., King Dep. p. 29). Regarding Hill's statement about a proposal to Brian Murphy, King recalled that Hill might have "put something together," but she really did not know for sure and did not want to say. (Ex. B., King Dep. pp. 29-30).

95.     Apparently Hill did send King an EEO/AA Implementation Plan, but King did not remember seeing it. (Ex. B., King Dep. p 51; Ex. A., Hill Dep. p. 111, Ex. 11). One of the points was to "[r]ewrite EEO/AA plan to reflect validity, but King says she does not know what Hill meant. (Ex. B., King Dep. p. 52). Nor does she recall what Hill meant when she said they needed to "[c]irculate, train, and disseminate plan to all city departments and contractors." (Ex. B., King Dep. p. 52). She did remember what they were talking about when they discussed "start-up money," or what Hill was talking about when she provided a breakdown of costs. (Ex. B., King Dep. pp. 30-31).

96.     According to Gail Woods, the person charged in the Police Department with obtaining the certification, the CPD would not get grant funds unless Hill or someone from her department certified the City had an affirmative action plan because the police plan was inactive. Hill only knew what she was told by Woods: that the CPD did not

have a plan. (Ex. A., Hill Dep. p. 147). Hill testified that Woods told her that the
Comptroller's Office had been signing the certifications but would no longer do it. (Ex.
A., Hill Dep. pp. 164-66). CPD obtained the funds when someone signed the
certification based on a City plan that never had been implemented at all. (Ex. A., Hill
Dep. pp. 87-90).

97.     Gail Woods from CPD asked Hill to sign off on a CPD grant request certification
because, Woods told her, the CPD did not have a current plan. Unless Hill used the City
plan as a basis for the certification, the CPD was not going to get grant money. (Ex. A.,
Hill Dep. pp. 64-65, 147, Ex. 5). A year later, Woods came to Hill with the same request
on a second grant application because without it the CPD would not get federal funding.
(Ex. A., Hill Dep. p. 66; Ex. B., King Dep. Ex. 14). Woods told Hill the reason: CPD did
not have an implemented affirmative action plan. (Ex. A., Hill Dep. pp. 68-69). CPD
came to Hill apparently after the Comptroller's Officer apparently would no longer sign
off and then came to Hill a year later with the same request, the CPD plan was just
temporarily inactive. (Ex. A., Hill Dep. pp. 147, 164-66). CPD obtained the funds when
someone signed the certification based on a City plan that never had been implemented at
all. (Ex. A., Hill Dep. pp. 87-90).

98.     On June 4, 2007, Devane emailed Hill a certification for her to sign that had been
sent to him by Gail Woods for the Chicago Police Department. (Ex. B., King Dep., Ex.
15). Hill would not sign again because she did not believe the City had a functioning
plan, and she so advised Woods. (Ex. B., King Dep., Ex. 14). Woods emailed Hill
thanking her for the update and asking to be kept apprised because the police had a

contract pending and they could not proceed without the certification. (Ex. B., King Dep., Ex. 14).

99.     On June 4, 2007, Hill emailed King to tell her that she had met with Torrick Ward who stated that he was going to discuss the issue with King, Hill, and someone else from law. (Ex. A., Hill Dep. Ex. 17 at Hill 0166).  The next day Hill emailed King that she was still waiting for a response from Law. (Ex. A., Hill Dep. Ex. 17 at Hill 0166; Ex. B., King Dep. p. 21).

100.    On July 12, 2007, Woods emailed Hill attaching the two grants and explaining that previously certifications had been signed by the Comptroller.  Last Fall, the Comptroller's Office indicated it could not sign off because they could not certify as to the City's EEO plan.  Woods explained that she made some phone calls and was referred to Devane and ultimately to Hill to sign the certifications. (Ex. B., King Dep., Ex. 18). Hill also advised King that she had been asked to sign off again but could not do so because she did not believe there was a functioning EEO plan. (Ex. B., King Dep., Ex. 18).

101.    After Hill brought her concerns to King, she set off a chain of events that make clear the City knew it did not have, but needed, a functioning affirmative action plan in order to receive federal funding.  Emails between Amy Kovalan, counsel who worked in the law department, reveal that the City began addressing this issue in 2007, even though the "plan" had apparently been in existence since 2005.  Significantly is the one thing Kovalan does not say: the City *does* have a plan.(Ex. A., Hill Dep. Ex. 17 at Hill 0176).

102.    On June 11, 2007, Kovalan writes in an email that the Mayor's Office has asked the Law Department to "explore having the required work done on behalf of the City as

an engagement through the Law Department." (Ex. A., Hill Dep. Ex. 17 at Hill 0176). They first need to complete the study, she says, the next step is to execute the plan. (Ex. A., Hill Dep. Ex. 17 at Hill 0176).

103.    Hill sent King an EEO/AA Implementation Plan but King testified she did not recall receiving it. (Ex. B., King Dep. p. 51; Ex. A., Hill Dep. p. 111, Ex. 11).  One of the points is to "[r]ewrite EEO/AA plan to reflect validity," but King does not know what Hill meant. (Ex. B., King Dep. p. 52).  Nor does she know what Hill meant when she said they needed to "[c]irculate, train, and disseminate plan to all city departments and contractors." (Ex. B., King Dep. p. 52).  When shown a copy of the "Equal Employment Opportunity/Affirmative Action Plan" King said she did not recall seeing anything like this before, or even seeing a similar document, even though it had her name on it. (Ex. B., King Dep. pp. 53-54, Ex. 11).

104.    King explained that back then Devane was the lawyer who was the deputy commissioner and they operate independently to make sure they implemented the rules. "I mean they could have done this on their own without me.  But I don't recall this." (Ex. B., King Dep. p. 54).  This is testimony from the Commissioner of the Department of Human Resources. (Ex. B., King Dep. p. 8)

105.    King testified that she did not recall anyone occupying the title as Director or Affirmative Action either before or after she was Commissioner at DHR, but she "assume[d]" the function was performed somewhere in compliance. (Ex. B., King Dep. p. 63).  Asked whether she was aware of an affirmative action advisory council at the time she was Commissioner of DHR, King testified that she could not recall. (Ex. B., King Dep. p. 64).

106.    Even after reviewing the "Equal Employment Opportunity/Affirmative Action Plan" King testified that it did not refresh her recollection as to whether there was ever an affirmative action advisory council. (Ex. B., King Dep. p. 65).  With respect to whether there was an equal employment opportunity officer in DHR she thought it might have been Bob Keller, but she was not sure. (Ex. B., King Dep. p. 69).

107.    King denied Hill's claim that King had agreed they had an affirmative action plan on paper only. (Ex. B., King Dep. p. 75).  She testified that Hill told her it was not functioning but King could not say whether it was functioning or not; she trusted what Hill told her. (Ex. B., King Dep. p. 75).  King testified that she did not recall any discussion or someone saying they should not sign off on the certifications.  She remembers only telling Hill her "mantra, never sign anything you are not comfortable with." (Ex. B., King Dep. p. 77).

108.    The plan called for DHR to assist in the development and adherence to affirmative action plans.  When asked about training other departments, all King could say was that DHR "did trainings on just general HR" and "I believe EEO affirmative action was a component of it." (Ex. B., King Dep. pp. 44-45).

109.    Devane wrote Hill that "[i]f CPD is not going to get their certification, someone should tell them and why." (King Dep., Ex. 16).  Hill responded that she told him and Bob Keller, the EEO Officer, why numerous times already: the City did not have a functioning  EEO plan. (Ex. B., King Dep., Ex. 16).

110.    Jamia McDonald from the Mayor's Office emailed Hill that it might be best to do the work through the Law Department. (Ex. B., King Dep. p. 24).  Referring to the necessity of having a written plan, Hill exchanged emails with, among others, Amy

Kovalan of the Law Department, regarding "getting this started immediately." (<u>Ex. A</u>, Hill Dep. Ex. 17 at Hill 0176). Kovalan wrote that the first step would be completing the study and the next step to execute the plan. Hill sent a return email that a previous proposal to Brian Murphy could be implemented and they would not have to forfeit their grants. (<u>Ex. A</u>, Hill Dep. Ex. 17 at Hill 0176).

111.   At her deposition, King testified that she did not recall what was meant by "implementing the program." (<u>Ex. B.</u>, King Dep. p. 27). Nor did she recall what McDonald meant by asking them to explore having the required work done. (<u>Ex. B.</u>, King Dep. p. 28). She did not recall what was meant by a "study" or what they meant when they talked about "execut[ing] the plan." (<u>Ex. B.</u>, King Dep. p. 29). Regarding Hill's statement about a proposal to Brian Murphy, King recalled that Hill might have "put something together," but she really did not know for sure and did not want to say. (<u>Ex. B.</u>, King Dep. pp. 29-30).

112.   Apparently Hill did send King an EEO/AA Implementation Plan, but King did not remember seeing it. (<u>Ex. B.</u>, King Dep. p. 51; <u>Ex. A.</u>, Hill Dep. p. 111, Ex. 11). One of the points was to "[r]ewrite EEO/AA plan to reflect validity, but King says she does not know what Hill meant. (<u>Ex. B.</u>, King Dep. p. 52). Nor did she recall what Hill meant when she said they needed to "[c]irculate, train, and disseminate plan to all city departments and contractors." (<u>Ex. B.</u>, King Dep. p. 52). She did not remember what they were talking about when they discussed "start-up money," or what Hill was talking about when she provided a breakdown of costs. (<u>Ex. B.</u>, King Dep. pp. 30-31).

Respectfully submitted,
THERESA HILL


By:     /s/  Sean M. Baker
        One of her attorneys

Steven J. Seidman
Sean Baker
LAW OFFICES OF STEVEN SEIDMAN
20 South Clark Street, Suite 700
Chicago, Illinois 60603
312-781-1977

Barry A. Spevack
MONICO & SPEVACK
20 South Clark Street, Suite 700
Chicago, Illinois  60603
312-782-8500