# EXHIBIT D

## Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA, )
ex rel, THERESA  HILL,    )
                     )
       Plaintiffs,   )
                     ) No. 2008 CV 4540
vs.             )
                     )
CITY OF CHICAGO,        )
                     )
       Defendant.   )

        The deposition of TORRICK WARD, called for examination pursuant to the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Christine Bechtold, at 20 South Clark Street, Chicago, Illinois, on the 9th day of May, 2013, at the hour of 9 o'clock a.m.

Reporter Name: Christine Bechtold
License No:  084-003575

## Page 2

```
 1      APPEARANCES:
 2      LAW OFFICES OF STEVEN J. SEIDMAN, by
        MR. SEAN M. BAKER,
 3      20 South Clark Street
        Suite 700
 4      Chicago, Illinois  60603
        312.781.1977
 5      sbaker@seidmanlaw.com
 6          Representing the Plaintiff;
 7      LANER MUCHIN DOMBROW BECKER
        LEVIN & TOMINBERG, LTD., by
 8      MS. HEATHER R.M. BECKER,
        515 North State Street
 9      Suite 2800
        Chicago, Illinois  60654-4688
10      312.467.9800
        Hbecker@lancermuchin.com
11
            Representing the Defendant, City of
12          Chicago;
13      PUGH, JONES & JOHNSON, P.C. by,
        MR. PRESTON PUGH and
14      MR. DAVID M. CAVES
        180 North LaSalle Street
15      Suite 3400
        Chicago, Illinois  60601
16      312.768.7800
        ppugh@pjjlaw.com
17
            Representing the Defendant, Torrick
18          Ward.
19
20
21
22
23
24
```

## Page 3

```
 1                  EXAMINATION
        Witness            Page   Line
 2
        TORRICK WARD
 3        By Mr. Baker              4   17
 4           ***************
                E X H I B I T S
 5      Ward Deposition Exhibit    Page   Line
 6        No. 1....................  20   13
          No. 2....................  58   16
 7        No. 3....................  74   13
          No. 4....................  77    9
 8        No. 5....................  81   18
          No. 6....................  85    4
 9        No. 7....................  92   15
          No. 8....................  94   17
10        No. 9....................  95   22
          No. 10...................  97    7
11        No. 11...................  102   4
          No. 12...................  102  13
12
13
14
15
16
17
18
19
20
21
22
23
24
```

## Page 4

```
 1              (Witness sworn.)
 2          MR. BAKER:  Mr. Ward, you were deposed in
 3   sort of a -- call it a companion case kind of thing.
 4   You know the ground rules.  You're an attorney.  So
 5   I'm not going to go through the ground rules with you
 6   because I take it you understand how a deposition
 7   works, okay.
 8          I just want to state for the record that this
 9   is a deposition of Mr. Torrick Ward taken pursuant to
10   the local rules of the Northern District of Illinois
11   and by agreement of the parties.
12   WHEREUPON:
13              TORRICK WARD,
14   called as a witness herein, having been first duly
15   sworn, was examined and testified as follows:
16          D I R E C T   E X A M I N A T I O N
17   BY MR. BAKER:
18      Q.  Can you just state and spell your full name
19   for the court reporter?
20      A.  My name is Torrick, T-o-r-r-i-c-k, Alan,
21   A-l-a-n, Ward, W-a-r-d.
22      Q.  Prior to the deposition beginning today, did
23   you review any documents to get ready for the dep?
24      A.  Yes.
```

Page 5

1    Q.  Do you recall what documents you looked at?
2    A.  Yes.  They were some documents from the -- I
3  believe it was an EEO short form, some certifications,
4  an e-mail. I can't recall anything else.  Perhaps
5  some meeting notes.
6         MR. BAKER:  Do you know if he reviewed
7  meeting minutes?
8         MR. PUGH:  Yes.
9         MR. BAKER:  Do you have a copy of those
10  meeting minutes?
11         MR. PUGH:  We can get a copy of the meeting
12  minutes.
13         MR. BAKER:  Just because if he looked -- I
14  just want to see and ask him about what he looked at.
15         Is that something we can do?
16         MR. CAVES:  Can we go off the record?
17         (Whereupon, a discussion was had
18            off the record.)
19  BY MR. BAKER:
20    Q.  Outside of the documents that you told me
21  about, have you reviewed any additional documents?
22    A.  No.
23    Q.  I just want to briefly go back over your
24  employment history with the City.

Page 6

1         Can you tell me when you started with the
2  City?
3    A.  In September of 1998.  Well, I worked there
4  as a law clerk in the summer of -- I think it was '96
5  or '97 as a law clerk, and then I continued as a law
6  clerk.  Then during the fall of my third year of law
7  school, I started as an assistant corporation counsel
8  in September of 1998.  I held that title until about
9  2004 when I was promoted to senior counsel.
10         I held that title until I transferred into
11  the compliance division of the law department, where
12  even though my title hadn't changed in the system I
13  was called the compliance attorney.  I held that title
14  until I moved to the new office of compliance where I
15  originally held the title of attorney, then senior
16  compliance officer, then deputy director.  I left the
17  City in the title of deputy director.
18    Q.  When did you start in compliance?
19    A.  When you say compliance, do you --
20    Q.  OCX.
21    A.  That would have been when the department
22  started which, if I recall correctly, was January of
23  2008.
24    Q.  Currently, you're in private practice,

Page 7

1  correct?
2    A.  Correct.
3    Q.  When you were in the office of compliance,
4  was your commissioner Anthony Boswell the whole time
5  you were in compliance?
6    A.  Yes.
7    Q.  Did you ever work for Commissioner King in
8  any capacity?
9    A.  No.
10    Q.  While you were in compliance, was
11  Commissioner King in charge of human resources, or was
12  it a different commissioner?
13    A.  When I was in compliance, there were several
14  commissioners in human resources.  I'm not sure if
15  Commissioner King was one of them.  I don't recall.
16    Q.  Have you ever seen the Complaint in this
17  case?
18    A.  I would be guessing, but I think so.
19    Q.  I think the gist of our allegations is that
20  the City didn't have a functioning or implemented
21  EEO/AA plan for a time period.
22         Are you aware whether or not at any time
23  while you were employed with the City that the City
24  did not have an implemented or functioning EEO/AA

Page 8

1  plan?
2         MS. BECKER:  Object to the form of the
3  question and foundation of the question, and to the
4  extent Mr. Ward's answer would get into
5  attorney/client privileged communication.
6         MR. PUGH:  I join in that objection.  I would
7  also raise the fact that you said the words
8  implemented and some other terms that are ambiguous,
9  and to the extent that answering the question would
10  require Mr. Ward to divulge attorney/client
11  communications, I instruct him not to answer to the
12  extent that answering would violate that.
13         MR. BAKER:  I'm not asking for any
14  communications between you and anyone at the law
15  department, but I believe that he would be able to
16  answer whether or not he was aware the City had a
17  functioning plan.
18         MR. PUGH:  Given my objections to the form
19  and also the use of certain unclear words, if he
20  understands, he can answer.
21         THE WITNESS:  Mr. Baker, could you explain
22  what you mean by "functioning?"
23  BY MR. BAKER:
24    Q.  I'll take out functioning, an implemented

Page 9

```
1   EEO/AA plan?
2        You understand the EEO/AA plan, correct?
3    A.  When you say EEO/AA plan, are you referring
4   to Equal Employment Opportunity/Affirmative Action
5   Plan?
6    Q.  Yes, sir.
7    A.  And when you say implemented -- I'm really
8   not trying to fight with you.  I'm trying to
9   understand what you mean when you say implement.
10   Q.  I'll give a preface.
11   A.  Okay.
12   Q.  I'll represent to you that through the course
13  of discovery in this case that I have received copies
14  of what appears to be an Affirmative Action Equal
15  Employment Opportunity plan on paper.  It lays out
16  certain things.
17       What I want to know is, was it actually put
18  into effect?  Was it implemented?
19       Rather than just sort of printing it out and
20  letting it sit wherever it would sit over at City
21  Hall, did they actually put it into use?
22       Do you understand what I'm talking about now?
23       MS. BECKER:  Some objections.  Objection to
24  the form of the question, and the foundation of the
```

Page 10

```
1   question.
2        And to the extent his answer may get into his
3   legal analysis within his capacity as an attorney, I'd
4   also object to be that as work product and potentially
5   attorney/client privilege.
6        MR. PUGH:  Join the same and instruct witness
7   as stated.
8        THE WITNESS:  I hope you can understand my
9   struggle here.  I'm trying to segment portions of
10  knowledge.
11       For the time period where I was not acting as
12  an attorney for the City -- and this is -- and frankly
13  I'm basing this on a not factual knowledge but a legal
14  analysis which I don't think is proper, but I'm just
15  going to answer anyway.
16       MR. PUGH:  Wait.  Wait.
17       THE WITNESS:  Should I or shouldn't I?
18       MR. PUGH:  If you're talking about your legal
19  analysis, I would instruct you not to answer.
20       MS. BECKER:  The City hasn't waived its
21  privilege with respect to your legal analysis.
22       THE WITNESS:  Just to make sure it's clear
23  why I'm saying that.  I'm not sure I can segment in my
24  mind the facts, the facts from a legal analysis of
```

Page 11

```
1   what you say.
2        You said implemented EEO plan, and I just
3   don't understand how to do that.  Really, I'm sorry.
4   I don't understand how to do that without knowing what
5   I know about the subject matter.
6   BY MR. BAKER:
7    Q.  Is it fair to say that there were times when
8   you were asked to -- let me back up.
9        Do you understand what I'm talking about when
10  I say certifications?  Earlier you mentioned that you
11  saw certifications.
12   A.  Certifications for what?
13   Q.  There were certifications that the City had
14  an EEO/AA plan that complied with certain federal
15  rules and laws and regulations.
16   A.  I did review such documents.
17   Q.  The documents that you reviewed, did they
18  have -- they had your signature on them, correct?  You
19  signed and dated those certifications.
20   A.  Yes.  They also had Dave Boswell's signature.
21   Q.  There were a few that might have had
22  Mr. Boswell's signature.
23       I'm not aware of any -- correct me if I'm
24  wrong -- where you both signed the same certification.
```

Page 12

```
1        It was either you or Mr. Boswell, correct?
2    A.  Correct.
3    Q.  That would be for the time period that you
4   were in the office of compliance, correct?
5    A.  Yes.
6    Q.  You were not in the law department acting as
7   an attorney in compliance, correct?
8    A.  No.
9    Q.  When you signed off on those certifications,
10  what did you do so that you knew the City was in
11  compliance with what was being certified in that
12  certification?
13       MR. PUGH:  I think you're running into the
14  same problem you had before.
15       Inasmuch as your answer would require you to
16  divulge attorney/client communications, I would strict
17  you not to answer.
18       And I'll object to the form of the question
19  as well.
20       MS. BECKER:  The City joins in those
21  objections.
22       THE WITNESS:  Segmenting out any legal
23  analysis or any privilege issues, the only thing I can
24  say is I knew that we had an EEOP in place.
```

Page 13

```
 1    BY MR. BAKER:
 2        Q.  How do you know that?
 3        A.  I looked at it.
 4        Q.  So you looked at the physical plan.  Remember
 5    in my preface before I talked about how I obtained
 6    printed plans, okay.
 7            So you looked at the copy of a plan or the
 8    plan, is that it?
 9        A.  There was other things that I did, but I
10    cannot divulge what I did.  There's other things I
11    knew that I can't divulge what I knew, if that makes
12    any sense.
13        Q.  Actually, it doesn't, but I'll see if I can
14    flush it out.
15            MR. BAKER:  It's getting to be a long dep.
16            MR. PUGH:  I understand that you guys have
17    attorney/client privilege issues.
18    BY MR. BAKER:
19        Q.  Did you ever follow up with any department
20    heads to find out whether or not the plan was being
21    implemented in any other departments?
22            MR. PUGH:  Again, we object, foundation and
23    form.
24            And then also to the extent that your answer
```

Page 14

```
 1    requires you to divulge attorney/client
 2    communications, I instruct you not to answer.
 3            MS. BECKER:  City joins in those objections.
 4            THE WITNESS:  As phrased, I don't think I can
 5    answer.
 6    BY MR. BAKER:
 7        Q.  So if you called up a commissioner, for
 8    instance, in a different department and asked them if
 9    they were implementing the plan, it's your
10    understanding that that would be legally privileged?
11            MR. PUGH:  That's a legal question for the
12    witness, and really what you're asking is what would
13    the parties say, would the parties find that to be
14    privileged.  I think that that's already been gone
15    over a little bit in this case.
16            MS. BECKER:  I think the problem is we're
17    dealing with a hypothetical.  So I object to the form
18    of the question to that extent.  He can't speak to
19    whether it's an attorney/client privileged
20    communication until we establish a timeframe and who
21    he contacted, what department he contacted, what
22    capacity he was acting in when he contacted that
23    individual, and then what was discussed.
24
```

Page 15

```
 1    BY MR. BAKER:
 2        Q.  The timeframe I'm dealing with is the
 3    timeframe that you signed those certifications.  You
 4    mentioned to me that you were acting in office of
 5    compliance, correct?
 6        A.  Yes.
 7        Q.  You were deputy director of compliance for a
 8    period of time, correct?
 9        A.  Yes.
10        Q.  So during that timeframe as deputy
11    director -- because I've seen, you know, what I
12    believe to be your signature and it indicates that you
13    were deputy director -- did you ever contact other
14    department heads to find out whether or not they were
15    putting the plan into effect?
16            MS. BECKER:  Object to the form of the
17    question.
18            MR. PUGH:  Same.  Join the objection.  We're
19    just going to make a continuing instruction with
20    regards to attorney/client privilege.
21            THE WITNESS:  When say "the plan," what are
22    you referring to?
23    BY MR. BAKER:
24        Q.  You mentioned to me in your answer that
```

Page 16

```
 1    before you certified, you looked at a plan, correct?
 2        A.  I looked at an EEOP.
 3        Q.  When you say "EEOP," what are you talking
 4    about?
 5        A.  I looked at the City's filed EEOP short form.
 6        Q.  Where did you get that?
 7        A.  I had a copy in my office.
 8        Q.  Do you know who provided it to you?
 9        A.  There were -- the first one, the answer is
10    yes, but I can't tell you who because it is
11    privileged.  It's clearly privileged, where I got the
12    first one.
13        Q.  I don't know that the individual that you
14    obtained something from would be privileged.  The
15    communication would be privileged.
16            For instance, if you said Amy Kovalan gave it
17    to you or the mayor gave it to you, I don't understand
18    how an individual providing it to you would be
19    privileged.
20            Just like before the deposition I asked you
21    if you looked at any documents.  I'm assuming that
22    your attorneys gave you the documents.  That wouldn't
23    be privileged.
24            MR. PUGH:  What's the City's position on
```

Page 17

1    that?
2         Does the City have a position?
3         MS. BECKER: When it comes to handling a
4    document, I think it depends on the context and was
5    there -- I mean, are you saying --
6         MR. BAKER: I'm just asking him who gave him
7    the document or who he got the document from.
8         MS. BECKER: I think that's fine.
9         THE WITNESS: I got the document partially
10   from myself, because I authored part of it, and I
11   received the rest from an accounting firm that helped
12   us create it.
13   BY MR. BAKER:
14   Q.  What time period are we talking about?
15   A.  This would have been prior to 2008.
16   Q.  So prior to 2008, you yourself played a role
17   in creating the EEOP short form that you're talking
18   about?
19   A.  Yes.
20   Q.  And also an outside firm?
21   A.  An outside accounting firm, yes.
22   Q.  Do you recall the name of the outside
23   accounting firm?
24   A.  Actually, I don't.

Page 18

1    Q.  After you created portions and the outside
2    accounting firm did their work and you certified the
3    short form, did you ever check with other City
4    departments whether or not they were implementing the
5    work you had done?
6         MS. BECKER: Object based upon the
7    attorney/client privilege, and form of the question to
8    the extent that it's vague and to the extent it
9    requires him to divulge attorney/client privileged
10   communications.
11        MR. PUGH: Same objection applies here.
12        THE WITNESS: Because the creation of the
13   original EEOP was done in my capacity as an attorney,
14   I do not believe, even when I was in compliance, I
15   could answer that question properly.
16   BY MR. BAKER:
17   Q.  I'm not asking you about what your legal
18   analysis was when you created the plan. I'm just
19   asking, for instance, if you called up streets and san
20   and said, do you have my short form and are you
21   following the directions in the short form?
22        MR. PUGH: That's clearly the core of the
23   privilege.
24        MS. BECKER: Not only privilege, but I'm

Page 19

1    going to object to the foundation of the question and
2    that it's a hypothetical question.
3         MR. PUGH: Sean, you're asking whether he
4    called a client and asked if the client was taking his
5    advice as a lawyer.
6         MR. BAKER: No, he's not acting as a lawyer.
7    He's deputy director of compliance.
8         MR. PUGH: He testified that he drafted the
9    form as a lawyer for the City.
10        MR. BAKER: Right, but he's also deputy
11   director. He's wearing two hats. So if he's acting
12   in compliance and asking if people are complying with
13   the work that he's done, that's way different than if
14   somebody's calling him for legal advice and asking him
15   for legal advice.
16        MR. PUGH: We would have to take that up
17   really, because that is the core of the privilege.
18        The fact is that if you tell one of your
19   clients today, I advised to do X, right --
20        MR. BAKER: I'm not asking for his advice.
21   I'm asking if he asked them if they are complying with
22   the EEOP plan.
23        MR. PUGH: You're asking him if his clients
24   followed his advice, if they informed him that they

Page 20

1    were following his advice. Every day, all day that is
2    clearly privileged, unless, for some reason, the
3    entity was waived the privilege.
4         MR. BAKER: I disagree. I guess we'll have
5    to call Judge Pallmeyer.
6         MR. PUGH: That's a clear compliance
7    question.
8         MR. BAKER: Off the record.
9              (Whereupon a short break was taken,
10                after which the following
11                proceedings were had:)
12             (Whereupon, Ward Deposition Exhibit
13                No. 1 was marked for
14                identification.)
15   BY MR. BAKER:
16   Q.  Go ahead and look through that for me,
17   Mr. Ward.
18   A.  All right.
19   Q.  You've had an opportunity to look at
20   Deposition Exhibit Number 1, correct?
21   A.  Yes.
22   Q.  The top sheet is clearly a communication
23   between counsel for the City and myself, and it
24   encloses the attachments behind it, correct?

Page 21

1     A.  Yes, I believe so.
2     Q.  The document behind it, at the top it says,
3  EEOP short form, correct?
4     A.  Yes.
5     Q.  These documents are all Bates stamped in the
6  lower right-hand corner, correct?
7     A.  Yes.
8     Q.  This EEOP short form, is this the document
9  that you helped create with the outside accounting
10  firm?
11     A.  Yes.
12     Q.  At the back of this document, the last page,
13  it bears your signature; is that fair?
14     A.  Yes.
15     Q.  When you signed that, it was your intent that
16  you were indicating that the City was in compliance
17  with the certification above it?
18        MR. PUGH:  Objection, foundation, and also
19  form of the question.  I understood, just through
20  leafing through this, there's more than one EEOP short
21  form.  And, in fact, there's more than one
22  certification.
23        If you're asking for whether his
24  certification counts for the document as a whole,

Page 22

1  meaning all of this exhibit, I'm not sure that we can
2  say that this exhibit is composed of just one
3  document.
4        MR. BAKER:  I'm just asking what his intent
5  was when he signed the certification.
6        MS. BECKER:  I'm going to object to the
7  extent his intent would go into work product as
8  attorney for the City.
9  BY MR. BAKER:
10     Q.  When you signed this you dated it, right?
11     A.  Yes.
12     Q.  At that time in 2010, were you deputy
13  director of compliance?
14     A.  Yes.
15     Q.  You weren't in the City's law department,
16  correct?
17     A.  No.
18     Q.  When you signed this, I mean, you were
19  signing as deputy director of compliance, correct?
20     A.  Yes.
21     Q.  At this time in 2010, was it the role of
22  compliance to sign off on EEOP certifications?
23        MS. BECKER:  Object to the foundation of the
24  question.

Page 23

1        MR. PUGH:  Also, ambiguous.
2        THE WITNESS:  For who?
3  BY MR. BAKER:
4     Q.  For the City.
5     A.  As a whole?
6     Q.  Yes.
7        MR. PUGH:  Same objection.
8        MS. BECKER:  Same objections.
9        THE WITNESS:  Not entirely, no.
10  BY MR. BAKER:
11     Q.  When you say, "not entirely," what do you
12  mean?
13     A.  There were other departments who signed off
14  on EEOPs.
15     Q.  Would police be one?
16     A.  Yes.
17     Q.  Do you know of other departments that would
18  have this ability outside of compliance in the police
19  department?
20        MR. PUGH:  Objection to foundation and form.
21  BY MR. BAKER:
22     Q.  In 2010?
23     A.  I don't know.
24     Q.  As you sit here now, you are aware of

Page 24

1  compliance's role and the police department's ability
2  to sign off on EEOP form certifications, correct?
3        MS. BECKER:  Object to the form of the
4  question.  It's vague.
5        MR. PUGH:  Same.
6        THE WITNESS:  If you say EEOP form
7  certifications, do you mean the certification that's
8  City 519, or do you mean the certifications that
9  accompany grants?
10  BY MR. BAKER:
11     Q.  Let me ask you this.  Your Exhibit 1, is
12  that -- which one is it for?
13     A.  The certification --
14        MR. PUGH:  Wait.
15        MR. BAKER:  He mentioned two types.  I want
16  to know which this falls under.
17        MR. PUGH:  Same objection that I made
18  previously.  If you're referring to the exhibit as a
19  whole, part of which Anthony Boswell certified, then
20  this lacks specificity.  There's a problem with the
21  foundation.
22  BY MR. BAKER:
23     Q.  Is there any part that's missing from this
24  short form?

Page 25

1      MS. BECKER: I think, Sean, just to clarify
2 what we're doing, there appear to be two
3 separate short forms in this stack. There's 499 through 508,
4 and then there's 509 through 519.
5      There's two separate ones, and they have
6 different dates on them. The one at 499 is
7 January 2008 through December 2009, and 599 -- I'm
8 sorry, 509 we have January 2010 to December 2011.
9 BY MR. BAKER:
10    Q. Do we have two short forms in your exhibit?
11    A. Yes.
12    Q. Which one did you sign off on?
13    A. The short form that ends at City 519.
14    Q. Does it begin at 509?
15    A. Yes.
16    Q. From 509 to 519, is there anything missing?
17    MS. BECKER: Objection to the form of the
18 question.
19    MR. PUGH: Join the objection.
20    THE WITNESS: I don't recall.
21 BY MR. BAKER:
22    Q. As you sit here now, does it look complete to
23 you?
24    MR. PUGH: Same objection.

Page 26

1      THE WITNESS: I don't recall. I honestly
2 don't recall all the information that was supposed to
3 be attached to these. I don't know. I don't know.
4 BY MR. BAKER:
5    Q. The short form that goes from 509 to 519, was
6 that for a grant, or was that for a different -- you
7 mentioned there were two types.
8    What were the two types that you mentioned
9 again?
10    A. The certifications that you have in front of
11 me, the two, they are certifying the EEOP short form,
12 but there is another document that is a certification
13 that is sent attached to an individual grant.
14    Q. What's your understanding of the purpose of a
15 short form?
16    MS. BECKER: Objection, foundation.
17    MR. PUGH: Join.
18    THE WITNESS: It is a form required by the
19 Safe Streets Act as a condition of receiving certain
20 federal grants.
21 BY MR. BAKER:
22    Q. Those grants are for?
23    A. I don't recall exactly.
24    Q. The information that's on Page 510, Step 2.

Page 27

1    A. Yes.
2    Q. Where did that information come from?
3    MS. BECKER: Objection, form, and foundation
4 of the question.
5    MR. PUGH: Join the objections. You can
6 answer if you know.
7    THE WITNESS: I don't recall specifically
8 where we got the information from. I'm not sure what
9 information fed into it is what I'm saying.
10 BY MR. BAKER:
11    Q. Let's go to Page 511, Step 3, City of Chicago
12 Community Labor Statistics.
13    A. Yes.
14    Q. Do you know where that information came from?
15    MS. BECKER: Same objections.
16    MR. PUGH: Join those objections.
17    THE WITNESS: To the best of my recollection,
18 this is a document prepared by, I think, the
19 Department of Labor, but I'm not sure about that.
20 BY MR. BAKER:
21    Q. With respect to Page 510, would that be
22 prepared by the Department of Labor as well?
23    A. 510, I don't believe so.
24    Q. Let's go to 512. 512 at the top says, Step

Page 28

1 Utilization Analysis.
2    Do you know where that information came from?
3    MS. BECKER: Same objections.
4    MR. PUGH: Join those objections.
5    THE WITNESS: I don't recall where.
6 BY MR. BAKER:
7    Q. Did you take any action to confirm whether or
8 not the information on 510, 511, or 512 was complete
9 or accurate?
10    MS. BECKER: Object to the extent his answer
11 would divulge into either attorney/client privileges
12 communications, or his analysis, which would be work
13 product of the City.
14    MR. PUGH: Instruct the witness accordingly
15 with respect to attorney/client privilege.
16    THE WITNESS: Would you repeat the question,
17 please?
18    MR. BAKER: Would you mind reading that back,
19 please.
20    (The previous question was read.)
21    MS. BECKER: Same objection.
22    MR. PUGH: Same objection. Same instruction.
23    THE WITNESS: Based on my client's
24 representation, I'm going to decline to answer.

Page 29

1 BY MR. BAKER:
2     Q.  Let's go to Page 513.
3     A.  Yes, sir.
4     Q.  513, Step 4B indicates Utilization Narrative.
5         Did you draft the Utilization Narrative?
6     A.  I don't recall.
7     Q.  If you didn't draft the Utilization
8 Narrative, who would have?
9         MR. PUGH:  Foundation objection, also form.
10         MS. BECKER:  Same objections.
11         MR. PUGH:  Standing instruction with respect
12 to attorney/client privilege.  You understand that?
13         THE WITNESS:  Sure.  There are a number -- I
14 won't say a whole lot, but there were -- how do I
15 answer this?
16         Your question is, if I did not draft this,
17 who would have?
18 BY MR. BAKER:
19     Q.  Yes.
20         MR. PUGH:  You're not asking him to guess.
21         THE WITNESS:  Clearly apart from the
22 privilege, I just don't remember.
23 BY MR. BAKER:
24     Q.  You not telling me that the information on

Page 30

1 this page is privileged, right, that I can't look at
2 it now, right?
3     A.  No, I'm saying I don't remember who would
4 have done it.
5     Q.  I just want to make sure that, you know --
6     A.  I'm just saying I don't remember.  I don't
7 remember who did it or who would have done it.
8     Q.  Can you tell me what steps you took, if any,
9 to verify whether or not the information on Page 513
10 was accurate?
11         MS. BECKER:  Objection with respect to
12 attorney/client privilege and attorney work product to
13 the extent those things would be gone into.
14         MR. PUGH:  Same instruction regarding
15 privilege.
16         THE WITNESS:  This one, I will decline to
17 answer based on the privilege.
18 BY MR. BAKER:
19     Q.  Can you tell me how in any way that this
20 information on this page is privileged, since I'm
21 looking at?
22     A.  That's not the question you asked me.  You
23 asked me did I -- I believe who I talked to or how did
24 I check the information on this, and that was with the

Page 31

1 communication the client.
2     Q.  So you did have a communication with someone
3 to verify whether or not this information was correct?
4         MR. PUGH:  Same instruction, again, to verify
5 whether the information was correct.
6         If you stopped at, so you did have a
7 conversation with the client, perhaps that would not
8 fall under the privilege, but to verify goes into the
9 actual substance of the communication.
10         MS. BECKER:  City joins in those objections.
11         THE WITNESS:  Based on the City's objection,
12 I decline to answer.
13 BY MR. BAKER:
14     Q.  Do you have any reason to doubt that the
15 information on this page is not true and accurate?
16     A.  I don't recall.  I don't recall if it's
17 accurate or not.
18     Q.  Let's go to Page 514, Step 5, Objectives.
19         Did you draft this page?
20     A.  I don't recall, but I think so.
21     Q.  What is it that makes you think so?
22     A.  Best answer I can give you is it reads to me
23 like something I would have wrote.
24     Q.  Stylistics come back to sort of make you feel

Page 32

1 like you would have drafted this?
2     A.  That, and I'm trying to go back these three
3 years in my memory.  And my memory isn't perfect.  I
4 apologize.
5         MR. PUGH:  You don't need to apologize he's
6 not asking you to guess either.
7         THE WITNESS:  I understand.
8 BY MR. BAKER:
9     Q.  In the Objectives portion it says that the
10 utilization study identified several areas of concern.
11         The study that it's referring to, are those
12 the preceding pages, or is that something different?
13     A.  Those are the proceeding pages.
14     Q.  The statistics that we saw on Pages 510
15 through 512?
16     A.  Yes, sir.
17     Q.  On Page 513, the Utilization Narrative, is
18 that a narrative of those pages, 510 through 512?
19         MS. BECKER:  Objection, foundation of the
20 question.
21         MR. PUGH:  Objection, vague.
22         THE WITNESS:  To the extent I understand your
23 question, Utilization Narrative is a narrative of
24 Step 4A, City 512.

Page 33

1    BY MR. BAKER:
2        Q.  So the narrative is only based on the
3    information on Page 512?
4            MS. BECKER:  Objection, form, foundation.
5            MR. PUGH:  Same.
6            THE WITNESS:  Is It based on the information
7    on 512.  It is a narrative of 512, but 512 is based on
8    the preceding pages, preceding two pages.
9    BY MR. BAKER:
10       Q.  So is it fair to say that 513 incorporates
11   information from 510 to 512?
12           MS. BECKER:  I would just like to object and
13   caution the witness that we may be getting close to
14   his legal analysis in preparing the document and to
15   the attorney work product of the City.
16           MR. PUGH:  Join those objections.
17           THE WITNESS:  I'm going to listen to my
18   client on that one.  They don't want me to answer, I'm
19   not sure if I can go any further with that.
20   BY MR. BAKER:
21       Q.  513, there's no privileged information in
22   there, correct?
23       A.  When you say privileged --
24       Q.  Is there attorney/client communication on

Page 34

1    513, Bates Stamp 512?
2        A.  I don't believe so.
3        Q.  So the information that is in a narrative,
4    that's sort of been boiled down into a narrative, came
5    from Pages 510 to 512?
6            MS. BECKER:  Just so my objection is clear.
7    I don't think we're -- the City isn't saying that the
8    content or the information on 513 is privileged
9    information.
10           I think your question goes into what
11   information was used or analyzed to prepare 514, and
12   that's where it borders on the attorney work product
13   and his legal analysis.
14           MR. BAKER:  Did you mean to say 513?
15           MS. BECKER:  No.
16           MR. BAKER:  Because I'm asking about 513.
17           MS. BECKER:  Right.  I thought he testified
18   he didn't know where this information came from.
19           MR. BAKER:  He sort of said in baby steps --
20   I'm just kind of paraphrasing -- that information came
21   from 512, and the information on 512 came from 510 and
22   511.
23           MS. BECKER:  Then 513 and 514.
24           MR. BAKER:  At this point, I'm just asking

Page 35

1    about 513.
2            THE WITNESS:  I'm sorry.  What's the
3    question?
4            MR. BAKER:  I don't know.  Let me see if I
5    can get you something that you can answer.
6    BY MR. BAKER:
7        Q.  I think my question was, was there any
8    attorney/client information on 513?
9        A.  You --
10           MR. PUGH:  Is the question, is 513 an
11   attorney/client communication?  Is that the question?
12           MR. BAKER:  Is there any information on there
13   that's privileged.
14           MR. PUGH:  The only reason why -- I object,
15   first of all, because the question is unclear, and it
16   does seem to potentially border on privilege if by
17   your question you mean was this information conveyed
18   to a client and was there a discussion about it.
19           MR. BAKER:  That's not what I'm asking at
20   all.  I think it's kind of clear.
21           All I want to know is, if he's putting Legos
22   together, okay, this is the big Lego at the end, the
23   big Lego house, did he use the little bricks from this
24   page and from this page and from this page to put the

Page 36

1    little Lego house together on 513.  That's what I'm
2    asking him.  I don't think that's privileged.
3            MR. PUGH:  Why are you asking then if there
4    is anything that's privileged on this page?
5            MR. BAKER:  Because you guys are maintaining
6    an attorney/client objection telling him not to answer
7    the questions that I've asked, and I think the
8    questions that I've asked are way outside of
9    attorney/client privilege.
10           MR. PUGH:  Some of your questions have been
11   appropriate and we have not objected and he's
12   answered.  Others of your questions have been
13   inappropriate and were protected by the
14   attorney/client privilege.  I know the Court has gone
15   around the bend on this issue quite a bit.
16           To the extent that you're asking him did he
17   convey this information to a client --
18           MR. BAKER:  That's not what I asked at all.
19   Can we go back and read it?
20           (The previous question was read.)
21           MS. BECKER:  I can answer that on behalf of
22   the City.
23           MR. PUGH:  This is a question of whether
24   there was anything privileged on this page.  You asked

Page 37

1  that.
2      MR. BAKER: I did.
3      MR. PUGH: What I'm telling you is that your
4  question is unclear. If your question is, is there
5  something about this page that potentially falls under
6  privilege, I'm telling you there's a circumstance
7  under which it would clearly be privileged. That
8  would exist if he's calling a client to talk about
9  this page.
10     MR. BAKER: I haven't asked him that. I
11 asked him if this information from 510 to 512 --
12     MR. PUGH: If you're striking your question,
13 then I don't have an objection.
14     If you're maintaining your question about
15 whether there's anything about this page that's
16 privileged, I'm maintaining the objection and
17 instruction.
18     MR. BAKER: I'm assuming that if this was
19 privileged, 513, I wouldn't be able to flip through it
20 and look at it. Call me crazy but --
21     MS. BECKER: I guess to that point, he lacks
22 the foundation to testify as to what the City has
23 asserted as privileged or not.
24     It's the City's document, and so it's not the

Page 38

1  City's position that the document itself is an
2  attorney/client privileged document.
3      If you're asking 510 through 512, if he
4  pulled together that information to create another
5  page, that is potentially attorney work product, the
6  City's attorney work product, which is where the City
7  cautions the witness. To the extent that would be his
8  answer or he would be divulging his analysis to create
9  512 or 513, that is privileged. But the actual words
10 on the piece of paper are not privileged.
11 BY MR. BAKER:
12     Q. Mr. Ward, if you could go to 513.
13     A. Yes, sir. I'm there.
14     Q. It says, "After reviewing the results of the
15 Utilization Analysis in 4A..."
16     Is it fair to say that you looked at the
17 analysis on 4A before you identified the information
18 that's contained in official administrators,
19 professionals, technicians, protected service,
20 protected service as non-sworn, administrative
21 support, and service and maintenance?
22     MS. BECKER: To the extent Mr. Ward prepared
23 this document as an attorney, the steps that he took
24 to put this information into the document potentially

Page 39

1  could be work product privilege. The City will object
2  on that ground.
3  BY MR. BAKER:
4      Q. You're not going to answer?
5      A. Give me a second, please. I mean -- I
6  apologize. I'm getting confused.
7      Are you asking me is the information from 513
8  based on 512?
9      Q. 512, 510, 511. I just want to know where
10 this information came from.
11     A. The Utilization Narrative is a narrative
12 version of the Utilization Analysis.
13     Q. Which is 4A, correct?
14     A. Correct.
15     Q. The information in 4A came from the
16 information that's in 510 on Bates Page 510 and Bates
17 Page 511, correct?
18     A. That is where that information is pulled
19 from, yes.
20     Q. And correct me if I'm wrong, but I believe
21 you said you did not recall whether or not you drafted
22 Step 4B on Page 513.
23     A. I do not recall.
24     Q. It may be, but you don't recall?

Page 40

1      A. I don't recall.
2      Q. Let's go to Page 515, please.
3      Do you recall whether or not you drafted
4  Page 515?
5      MR. PUGH: Asked and answered, but you can
6  answer it.
7      MR. BAKER: I don't think I got to 515.
8      THE WITNESS: I think I did.
9  BY MR. BAKER:
10     Q. You think you did draft this?
11     A. Yes.
12     Q. The same reason being it looks like your
13 language or style of writing?
14     A. No. I believe I drafted this. It's not just
15 because of the style of writing.
16     Q. What gives that you that belief as you sit
17 here now three years later?
18     A. It's just to the best of my recollection.
19     Q. The information that's in there, you believe
20 that to be true and correct?
21     MS. BECKER: Object to the foundation of the
22 question and the form.
23     MR. PUGH: Join the objection.
24     THE WITNESS: The information in 515 and 516,

Page 41

```
 1    is that what --
 2    BY MR. BAKER:
 3        Q.  You can go to 516.
 4        A.  Let me read it, please.  I just have to add
 5    the caveat that I was only there until May, to the end
 6    of May of 2010.  But for the time I was there, we did
 7    these things.
 8        Q.  I'm not asking you if you did them.  I'm just
 9    asking you if the information that's on --
10        A.  Yes, it is true.
11        Q.  True and accurate?
12        A.  Yes.
13        Q.  Because as deputy director for the City of
14    Chicago and the office of compliance, it wasn't your
15    role to draft documents or certifications that had
16    misleading or inaccurate information, correct?
17            MR. PUGH:  Objection, vague and ambiguous
18    question.  Also asks the witness for a legal opinion
19    on what part of his job covered the drafting of this
20    document.
21            MR. BAKER:  You want it hanging out there
22    that he was able to draft misleading and inaccurate
23    documents?
24            MR. PUGH:  I don't know if anybody said that.
```

Page 42

```
 1            MR. BAKER:  That's basically what I'm asking
 2    him.
 3            MR. PUGH:  That's not what I heard.  You can
 4    go back to the question.
 5    BY MR. BAKER:
 6        Q.  As deputy director, was it your role to draft
 7    documents that had misleading or incorrect information
 8    in them?
 9        A.  That was not my job.
10        Q.  It was your goal to be as accurate and
11    correct as possible when you authored these documents,
12    correct?
13            MR. PUGH:  Objection, vague, ambiguous.  What
14    part of the job are you talking about?
15            MR. BAKER:  I'm talking about when he was
16    deputy director of compliance.
17            MR. PUGH:  This is raised only because you
18    made a distinction earlier between the deputy director
19    role and the other functions.
20            MR. BAKER:  I haven't asked him about his
21    other functions.  I think I've narrowed it down.
22    We're talking about 2010 when he's deputy director
23    when he's drafting this.
24            MR. PUGH:  Okay.
```

Page 43

```
 1            MR. BAKER:  I'd kind of want my client to
 2    say, yeah, it was my goal to be accurate and correct.
 3            MR. PUGH:  I want him to answer a question
 4    that's clear.
 5            THE WITNESS:  To the extent I understand your
 6    question, it was always my job to ensure that I was
 7    complying at all times with any law, ordinance,
 8    statute, of the United States, the State of Illinois,
 9    the City of Chicago, Cook County.
10    BY MR. BAKER:
11        Q.  In doing that, the function was to be
12    accurate and correct?
13        A.  I'm standing with my answer.
14        Q.  In complying with U.S. law, would there be
15    any function as deputy director that would allow you
16    to put down incorrect and inaccurate information into
17    the documents that you created?
18        A.  Mr. Baker, respectfully, I cannot answer that
19    without giving you a legal analysis of what I did.
20    There are some statutes that don't -- I mean, you
21    know, there's questions of good faith, there's
22    questions of how you -- and I can't stop being a
23    lawyer in this conversation, because you're asking me
24    a legal opinion.  Was that my job?  I don't know.
```

Page 44

```
 1    I mean, I can't say that as a factual basis.
 2    There's not a simple, factual answer for that
 3    question.
 4            MR. PUGH:  We'll also object to the question
 5    as argumentative.
 6            THE WITNESS:  I mean, to the extent that it
 7    was my job to follow the law, I followed the law.
 8    BY MR. BAKER:
 9        Q.  But that wasn't my question.  My question
10    didn't ask you if it was your job to follow the law.
11    My question asked you if --
12            MR. BAKER:  Can you read back my question
13    where I asked if it was something along the lines of
14    his goal to be complete and accurate.
15            (The previous question was read.)
16            MS. BECKER:  Objection, asked and answered.
17            MR. PUGH:  Same objections that were made to
18    that question apply here.
19            THE WITNESS:  It was always my goal to comply
20    with every applicable law.
21    BY MR. BAKER:
22        Q.  That's not my question.
23        A.  That is the only answer I'm going to give.
24        Q.  Let's go to 517.
```

Page 45

1        Did you author the information on 517?
2    A.  I believe so, yes.
3    Q.  As deputy director, did you yourself do the
4  utilization analysis to find out whether or not -- for
5  instance, like on Page 517 here, it says study of
6  white female under utilization.  When I read this, I
7  take it somebody -- maybe it wasn't you, but somebody
8  in compliance, a compliance officer or somebody, went
9  out to try to determine how white females were being
10  employed, whether they were over utilized, under
11  utilized.
12        Is that something you did yourself as deputy
13  director, or is that something that a different
14  compliance officer, someone under you, would have
15  done.
16    A.  That would have been a larger project
17  undertaken in consultation with department of human
18  resources.
19    Q.  So compliance would somehow cooperate with
20  HR?
21    A.  We would.
22    Q.  You would cooperate with DHR somehow,
23  correct?
24    A.  Yes.

Page 46

1    Q.  You would determine the utilization of
2  certain categories of individuals working for the
3  City?
4    A.  Specifically as to white female under
5  utilization, as to Number 5, we would be specifically
6  looking at why that under utilization existed.
7    Q.  Who is it that would sit down and find out
8  like, okay, we've got so many white females at the
9  City, how are they employed, where are they employed,
10  you know, how many hours are they working?
11        That would be a utilization analysis but
12  boiled down, correct?
13    MS. BECKER:  Object to the form of the
14  question.
15    MR. PUGH:  Same objection, timeframe.
16    THE WITNESS:  It's more correct to say that
17  this would be -- we know what their utilization would
18  be.  This was an attempt to find out why.
19  BY MR. BAKER:
20    Q.  But the information to determine that there
21  was an under utilization, who, like department-wise,
22  OCX, DHR, who came up with that information?
23    MS. BECKER:  Objection, form.
24    MR. PUGH:  Same objection.

Page 47

1    THE WITNESS:  I'm not sure where all the
2  information that made up -- I just don't recall as I
3  sit here where all the information that is included in
4  510 through 512 came from.  But as you see on 512,
5  that identifies the under utilization.
6  BY MR. BAKER:
7    Q.  The outside consulting group, did they do any
8  under utilization analysis?
9    MR. PUGH:  Objection, vague.
10    MS. BECKER:  I'm going to object to the
11  foundation as to what they did as well.
12    THE WITNESS:  I don't recall the scope of
13  whether this was data compilation or analysis.  I
14  don't recall.
15  BY MR. BAKER:
16    Q.  Outside of that outside consulting group,
17  what department or departments at the City would be
18  involved in gathering the information to put this
19  under utilization information in 510 through 512
20  together?
21    MS. BECKER:  Objection, foundation.
22    THE WITNESS:  The only department I know of
23  would be the department of human resources.  There may
24  be other City departments.

Page 48

1  BY MR. BAKER:
2    Q.  Let's go to Page 518.
3        Do you know if you authored Page 518?
4    A.  I believe I did.
5    Q.  Is that based on your recollection?
6    A.  That's based on the best of my recollection.
7    Q.  On Page 519 where it says, "I have reviewed
8  the foregoing EEOP short form and certify the accuracy
9  of the workforce data and our organization's
10  employment policies," what steps did you take that
11  allowed you to certify the accuracy of what's stated
12  in that sentence?
13    MS. BECKER:  I'm going to object to the
14  extent the answer of the question will divulge
15  attorney/client communications or his attorney work
16  product.
17    MR. PUGH:  Join the objection and instruct
18  the witness accordingly.
19    THE WITNESS:  What steps did I take to be
20  satisfied that I could certify this is?  Is that a
21  fair paraphrase?
22  BY MR. BAKER:
23    Q.  I guess that's a fair way to sort of
24  paraphrase my question, yes.

Page 49

1    A.  To be honest, I don't remember what I did.
2  It was a long time ago.  I know I did.  I just don't
3  remember what I did.
4    Q.  Do you remember any of what you did?
5    MS. BECKER:  Same objections.
6    MR. PUGH:  Join.  Same instruction as well.
7    THE WITNESS:  May I ask the City's counsel do
8  they consider this work product?
9    MS. BECKER:  I'm sorry?
10    THE WITNESS:  Do they consider the answer to
11  this question work product?
12    MS. BECKER:  We may need to have a
13  conversation outside so I know what your answer would
14  be.
15    THE WITNESS:  May I have a moment?
16    MR. BAKER:  There's a question that's
17  pending.  They don't necessary have an objection, and
18  you're asking them if they should make an objection.
19    MS. BECKER:  I have an objection to the
20  extent his answer would involve attorney/client
21  privilege and attorney work product.  And without
22  knowing what his answer will be, I can't determine
23  whether it, in fact, is attorney/client privilege or
24  work product.

Page 50

1    MR. PUGH:  I will not subject my client to
2  potential recourse from the City for divulging work
3  product or attorney/client privilege communications.
4    MS. BECKER:  With respect to what your
5  question was, what steps did he take, potentially it
6  may very well not cross over that line and he may be
7  able to answer the question, but without knowing, I
8  can't --
9    MR. BAKER:  He's a lawyer.  He knows what
10  client communications are.
11    MS. BECKER:  But he's also not a lawyer for
12  the City.  I am.  And the City hasn't waived any work
13  product or attorney/client privilege.
14    MR. PUGH:  I will instruct you if you think
15  there's one slight possibility that it could be
16  protected, I instruct you not to answer.  You can
17  continue.
18    THE WITNESS:  Based on the advice of my
19  counsel, I won't answer.
20  BY MR. BAKER:
21    Q.  Is it fair to say that you read the short
22  form before you signed it?
23    A.  Yes.
24    Q.  So you can include that as a step that you

Page 51

1  took before you signed off, correct?
2    A.  Yes.
3    Q.  Now, it talks about our organization's
4  employment policies.
5    Our organization, that would be the City,
6  correct?
7    A.  Yes.
8    Q.  And the employment policies that are referred
9  to there, what employment policies are you talking
10  about?
11    A.  To answer that question I would be making
12  reference to the federal regulations which I would
13  have read before I signed that, and, honestly, I don't
14  know if I can answer that question without giving a
15  legal opinion about whether -- about how I analyzed
16  the problem.
17    Q.  I'm not focused on any problem analysis
18  because it doesn't -- I mean, there's no mention of
19  problem analysis in the certification.
20    A.  No, there is --
21    Q.  It says you reviewed the short form, so we
22  have that as a step.  Another step is you certified
23  the accuracy of the reported workforce data.
24    I'm assuming -- this is maybe a leap, so I

Page 52

1  shouldn't assume -- the reported workforce data that's
2  mentioned in this certification is the information
3  that's contained on Pages 510 through --
4    A.  I didn't take that to be your question.  I
5  thought you were asking about the organization's
6  employment policies.
7    Q.  I'm going to get there.
8    The workforce data would be the information
9  that's on Pages 510 to 513, correct?
10    A.  Yes.
11    Q.  It says, "our organization's employment
12  policies," so the City of Chicago's employment
13  policies.  I'm just curious what the -- I'm not asking
14  about federal rules or laws.  I'm asking what the City
15  of Chicago's employment policies are that you're
16  certifying here.
17    A.  You're asking me what policies existed at the
18  time?
19    Q.  I mean, it's your certification.  I'm trying
20  to figure out what you're certifying here.  It talks
21  about our organization's employment policies.  I want
22  to know which employment policies those are that
23  you're talking about that this stuff complies with
24  those policies.

Page 53

1      A.  As I said, before I would have signed the
2  document I would have read the federal regulations.
3  As I sit here today, I don't know what organization's
4  employment policies mean.  I just don't know.  I don't
5  remember.  I would have remembered at the time before
6  I signed it.  That's why I'm saying I can't answer
7  your question.
8          I just don't recall what is meant by that
9  statement at this time without reference to the
10  regulations.
11      Q.  The City of Chicago employment policies, were
12  they ever contained in a book or booklet or some
13  printed form where you could grab it and look at it?
14          MS. BECKER:  Object to the foundation of the
15  question.
16          THE WITNESS:  The City's employment policies
17  were contained across many documents.
18  BY MR. BAKER:
19      Q.  Can you give me some examples or tell me what
20  your recollection is?
21      A.  There would have been the City's personnel
22  rules.  There would have been the City's diversity
23  opportunity plan.  There would have been the police
24  department's general orders, rules.  There would be

Page 54

1  the fire department's general orders, rules.  There
2  would have been individual orders and rules of
3  individual City departments.  There would have been --
4  there's more.  I mean, I really can't recall.  They
5  were contained in a number of places.  And the
6  municipal code had employment policies.
7      Q.  Is it fair to say as you walked around as
8  deputy director you didn't have all of this
9  information memorized in your head, right, all of
10  these employment policies?
11          MS. BECKER:  Objection form of the question.
12          MR. PUGH:  Join the objection.
13          THE WITNESS:  At the risk of sounding
14  arrogant, I was fairly conversant on the City's
15  employment policies at the time.  I'm not as
16  conversant as I was at the time.
17  BY MR. BAKER:
18      Q.  I get that you may be conversant.  I think
19  that I'm pretty conversant in some stuff as a lawyer,
20  too, okay.  But as I sit here right now, even if I
21  worked with 28-CFR all day long, I wouldn't try and
22  rattle it off the top of much my head.  I might be
23  familiar with it and how it applies and be able to
24  give legal advice on it, just like you do.

Page 55

1      A.  Sure.
2      Q.  So basically the gist of my question is,
3  you're not an encyclopedia inside your head.
4          You have familiarity with these things,
5  correct?
6      A.  Familiar with what things?
7      Q.  With the City's -- at the time you were
8  working in the City, you had familiarity with these
9  employment policies, correct?
10          MS. BECKER:  Object to the form of the
11  question.
12  BY MR. BAKER:
13      Q.  Or, as you said, conversant.
14      A.  I was aware of many -- I don't know exactly
15  how to answer the question.  I was aware of the City's
16  employment policies.
17      Q.  It's fair to say that you didn't just blindly
18  sign off on this certification?
19          MS. BECKER:  Objection, form of the question.
20          MR. PUGH:  Objection, vague.
21          THE WITNESS:  I ensured before I signed the
22  document that I would be telling the truth.
23  BY MR. BAKER:
24      Q.  Before you signed off on the short form

Page 56

1  that's 509 to 519, did you look at any other prior
2  short forms that had been executed by anyone else at
3  the City?
4      A.  Before I signed 519?
5      Q.  Yes.
6      A.  Yes, I did.
7      Q.  Do you recall which ones you looked at?
8      A.  The one I can recall looking at is the one
9  that ends at City 508.
10      Q.  The one that ends at 508 begins on 499?
11      A.  Yes.
12      Q.  That, too, is an EEOP short form?
13      A.  Yes.
14      Q.  What is your understanding of when an EEOP
15  short form is used rather than just the full fledged
16  EEOP certification?
17          MS. BECKER:  I'm going to object to the
18  extent that requires Mr. Ward to divulge either
19  attorney/client privilege communication or his
20  attorney work product on behalf of the City.
21          MR. PUGH:  I instruct the witness not to
22  divulge EEOP communications, but the question is also
23  vague and lacks foundation because there's no
24  timeframe.

1      THE WITNESS:  Given those objections, I would
2  just tell you I don't remember why you use the short
3  form over the long form.  There was a reason.  I don't
4  remember what that reason was.
5  BY MR. BAKER:
6      Q.  Do you know if a short form was used, for
7  instance, if a signature had already been on file for
8  that type of grant and rather than have to complete
9  the entire grant form again you could use a short form
10  to update information that was already in that grant
11  application?
12      A.  I'd be guessing, so I have to decline to
13  answer.  I just don't know the answer to that
14  question.
15      Q.  If you had to go to somebody to find out at
16  the City, who would you go to outside of, like, a
17  lawyer?
18      MS. BECKER:  I'm going to object to the
19  foundation and form of the question.
20  BY MR. BAKER:
21      Q.  Back during the time when you were deputy
22  director.
23      A.  If I had to go back to somebody to find out
24  what?

1      Q.  Short form hits your desk.  You want to find
2  out whether you need to use the short form or the long
3  form.
4      Sitting here now you don't know who you would
5  go to to find out?
6      MS. BECKER:  Objection, speculation.
7      THE WITNESS:  I would read the long.
8  BY MR. BAKER:
9      Q.  So that's something that you could do
10  yourself then?
11      A.  Yes.  I'm an attorney.
12      MR. BAKER:  This is going to be marked as
13  your Deposition Exhibit Number 2.  While you look that
14  over, why don't we just take a break?
15          (Whereupon, Ward Deposition Exhibit
16           No. 2 was marked for
17           identification.)
18  BY MR. BAKER:
19      Q.  Mr. Ward, a document has been placed in front
20  of you that's been marked as your Deposition Exhibit
21  Number 2, correct?
22      A.  Yes.
23      Q.  Do you recognize that?
24      A.  No.

1      Q.  Is it fair to say that this would not be one
2  of the documents you reviewed prior to the deposition
3  beginning today?
4      A.  No, I did not.
5      Q.  Having looked at this, do you recall
6  receiving -- it says from Theresa Hill to Torrick
7  Ward, and it's dated.
8      Do you recall receiving this and looking at
9  it?
10      A.  I don't recall.
11      Q.  In December of 2008, you were in compliance
12  at that time?
13      A.  Yes.
14      Q.  Was your title deputy director?
15      A.  I don't recall.
16      Q.  Prior to becoming deputy director, you were
17  senior compliance officer; is that fair?
18      A.  Yes.
19      Q.  Is it fair to say that you were either titled
20  senior compliance officer or deputy director at and
21  around the time that this is dated?
22      A.  No.
23      Q.  What else could you have been?
24      A.  When the office of compliance was first

1  organized, my title changed from senior counsel --
2  actually assistant corporation counsel supervisor to
3  attorney.  So my original title in compliance was
4  attorney.  I don't recall when it changed.
5      Q.  Do you have any reason to doubt any of the
6  information that's contained on here?
7      I'll preface that it says, "Pursuant to your
8  request for feedback."  I'm assuming that there was a
9  request, and she's giving you feedback based on that
10  request.
11      MS. BECKER:  Objection, form of the question.
12  I apologize if you weren't done.
13  BY MR. BAKER:
14      Q.  Do you have any reason to doubt that?
15      MR. PUGH:  We join in those objections.  It
16  lacks foundation.
17      THE WITNESS:  I don't recall this document or
18  why it was created.
19  BY MR. BAKER:
20      Q.  Having looked at it, is there anything that
21  stands out to you that's, like, patently wrong or just
22  that's not true or correct?
23      MS. BECKER:  Same objections.
24      MR. PUGH:  Same objections.

Page 61

1      THE WITNESS: On the second page of the
2  document, which is not numbered, under Legal Appeals,
3  Cultural Appeals and Rational Self Interest, I would
4  have some questions about that title, but then the
5  first sentence, "The City culture is one endemic with
6  a cultural history of misconduct and mistreatment of
7  subordinate, non-clouted employees," I disagree with
8  that statement. I think that's vastly overstating the
9  problem.
10      I generally feel the same way about the rest
11  of the paragraph. That paragraph is extreme in its
12  belief.
13      MR. PUGH: Just to clarify, when you asked if
14  there's anything that's inaccurate, he pointed out two
15  things.
16      Do you need him to tell you everything that's
17  in here that he feels is inaccurate several years
18  after this was drafted?
19      MR. BAKER: I'd like him to. I'd like him to
20  go through and say -- I mean, from his prior dep, you
21  know, there was some questions and answers about
22  Ms. Hill and sort of like a lack of diplomatic
23  approach to things, and she used certain language, and
24  maybe that's what he's touching on here.

Page 62

1      MR. PUGH: Just to -- you know, maybe I
2  should make this clear --
3      MR. BAKER: That's what I'm getting at. Does
4  he disagree with this? Does he disagree with the way
5  she's voiced it?
6      MR. PUGH: Let me be very clear about this.
7  This deposition is only being used for this case.
8      MR. BAKER: Yeah, I'm not using it for any
9  other case. Discovery's close in the other case. I
10  couldn't use it if I wanted to.
11      We've got the Motion for Summary Judgment
12  fully briefed. I'm not trying to backdoor anybody
13  here.
14      MR. PUGH: So this --
15      MR. BAKER: But I can't forget the fact that
16  we talked about Theresa Hill in a certain -- you know,
17  he asked her to do things, and I think -- I'm
18  paraphrasing, but I think it was sort of said by him
19  and maybe other witnesses that she didn't have tact.
20      So if there's language in here that's not
21  tactful or is aggressive or however -- you know, I
22  don't want to put words in his mouth. But I kind of
23  get what he's saying when he was talking about the
24  first sentence. So that kind of stuff I'd like him to

Page 63

1  talk about.
2      So if it says, you know, for instance, if
3  there's a number ten in here and he says, no, it
4  wasn't ten, it was a hundred. If that's something he
5  could point out, I'd like him to point it out.
6      If he disagrees with her verbiage, I'd like
7  him to point that out to me.
8      MR. PUGH: Based our agreement that this
9  deposition is not going to be used for any other case
10  other than this U.S. ex rel Theresa Hill versus City
11  of Chicago, then you can proceed and answer, if
12  there's anything that you find in the document sitting
13  here five years later as responsive.
14      THE WITNESS: I'm on the first page.
15  BY MR. BAKER:
16      Q. Back Page 1?
17      A. Yes. Under Management Standards and
18  Accountability, I'm in the middle of that first
19  paragraph.
20      Q. Can you point it out to me?
21      A. Yes. I'm pointing out a statement that says,
22  "If a City manager is found in violation of an EEO
23  policy, the City can be deemed solely liable and
24  responsible for mitigation of the harm."

Page 64

1      I'm not sure that's accurate. I just don't
2  think that's correct the way it's stated.
3      I'm on the third page of the document.
4  Again, they're not numbered. I believe the client
5  Mitsubishi, in the first paragraph -- I don't know,
6  and so I'm not going to say it's correct whether it
7  was millions or potential millions lost. I haven't
8  read those cases in a long time.
9      I disagree with the bolded paragraph. I'm
10  not sure if the City is a government contractor. I
11  don't even know if that's true or not, but I don't
12  think they defaulted on them.
13      I don't know if I agree that the City's at
14  risk of losing millions of dollars of federal funding.
15      I don't think the City would shut down. I
16  think that's alarmist, frankly.
17      Under Cultural Appeals, I don't believe in
18  the first sentence which starts, "I would enlist the
19  training of noted organizational change educator
20  Morris Massey. His basic premise is based on the
21  everyday person. He believes that who you are is what
22  you were when, basically stated if you were born a
23  raised you will remain racist unless you have a
24  significant paradigm shift, and significant emotional

Page 65

1   event in your life that triggers behavioral change."
2      I disagree with that statement, and I have
3   personal reasons for disagreeing with that statement.
4   I know it to be untrue.
5      I don't agree we would hire -- I would never
6   recommend to hire someone like that for cultural
7   change training.
8   BY MR. BAKER:
9     Q. When you say someone, you mean Mr. Massey?
10    A. Yes.
11    Q. Do you know who he is?
12    A. I've heard the name. I don't know him.
13      He is phenomenal, I would disagree with that
14   just based on the statement above.
15      I don't agree with, this would have been the
16   only chance we have to effect cultural change besides
17   attrition.
18      Under the Performance Management section, I'm
19   just going to say that I don't agree with most of the
20   paragraph. I don't think it's necessarily correct
21   that the City had no tool or effective tools to
22   measure performance. I'm not sure what's meant by PM.
23     Q. That was going to be one of my questions.
24      What's the PM?

Page 66

1     A. I'm not sure what that is.
2     Q. Okay.
3     A. The Oracle performance evaluation tool is
4   outdated and not user friendly, I don't know whether
5   that's true or not.
6     Q. Do you know what the Oracle performance
7   evaluation tool is?
8     A. I don't know what she's referring to. I'm
9   not sure what -- I should say I'm not sure what she's
10   referring to here.
11     Q. Do you know if it was some type of database?
12   I know Oracle does databases, that's the only reason
13   I'm throwing that out there.
14      Had you ever used, like, an Oracle system or
15   something?
16     A. I have used an Oracle system at the City,
17   yes.
18      Under Strong and Effective Policy, I mean,
19   this is just a -- I don't think that the diversity
20   policy is a prop to illegally receive federal funds.
21   I think that is alarmist and unreasonable, saying that
22   statement.
23      The statement, "My strongest concerns are
24   that the City is not eligible to receive federal

Page 67

1   funding and has not for years," I don't agree with
2   that statement.
3      I'm not sure if -- this is not a factual
4   statement. This is her suggestion, that the
5   responsibility rests with the enforcers of the policy,
6   office of compliance. She is referring to the
7   diversity policy. The reason -- we have to follow the
8   City's municipal code, and I can't -- one of the
9   things about that is we can't take away the power of
10   the department heads to manage their department. So I
11   just didn't agree with that. I don't believe that,
12   and we just couldn't do it the way it's stated here.
13      I don't know that I would seek corporate
14   models as sponsorship. Operationally, I don't think
15   that would work.
16      Where it says the legal ramifications and
17   consequences of not having done the right thing for so
18   many years, I just don't think that's correct.
19     Q. When it says, "succeed where I have failed,"
20   is she talking about herself from what you gleaned
21   from this?
22     A. I'm not going to speculate as to what she's
23   referring to. She says I, so I'll leave it at that.
24     Q. When she says not having done the right thing

Page 68

1   for so many years, do you know what -- reading this
2   now, do you know what she's talking about?
3     A. I don't know what Theresa was talking about.
4   I do know she hadn't been with the City that many
5   years at the time of this, so I'm not sure where she
6   had a factual base to say that, which is one of the
7   reasons I disagree with it.
8      I disagree with the next paragraph. I don't
9   think that would work. I think it would lead to more
10   fear, and it would be more problematic. It would
11   literally be seen as an onerous task for the
12   department heads, and they would wind up resenting it,
13   and that's just not a good way to handle a diversity
14   program.
15     Q. Can I just stop you there before you
16   continue?
17     A. Yes.
18     Q. It talks about a diversity counsel.
19      Was there a diversity counsel at this time?
20     A. There was -- I'm not sure if -- I mean, I
21   don't know at this time. At one point, there was an
22   executive diversity committee.
23     Q. When you say at one point in time, do you
24   recall what point in time that was?

Page 69

1    A.  I don't.  I'm sorry.
2    Q.  Had you ever been -- have you ever observed
3    that council, their operation?
4    A.  At some times, yes.
5    Q.  Do you know who made you that council?
6    A.  I don't recall off the top of my head.
7    Q.  Do you have any recollection as to any
8    individual?  You might not recall the whole council,
9    but you might recall, oh, I was part of it.
10    A.  I was part of it.
11    Q.  So we can say you were definitely part of
12    this council.
13        So you can say it existed legitimately
14    because you were part of it, correct.
15    A.  Yes.
16    Q.  You just don't recall at what point in time
17    it existed?
18    A.  I don't know what we brought -- it was part
19    of our diversity and equal opportunity plan we brought
20    that into existence.
21    Q.  Let me come at it this way.  Because you had
22    a tenure with the City for a long period of time, did
23    this come into existence while you were part of
24    compliance?

Page 70

1        MS. BECKER:  Object to foundation.
2    BY MR. BAKER:
3    Q.  When I say compliance, I mean the OCX.
4    A.  I understand your question.  The answer is,
5    I'm sorry, a little more nuanced.
6        This was a successor committee to the -- I
7    think it was either called the affirmative action
8    committee or something like that, which is a
9    predecessor committee which existed prior to my
10    becoming responsible for it.
11    Q.  The affirmative action committee, do you
12    recall if you were part of that committee or if there
13    were other individuals that you can recall as being
14    part of that committee?
15    A.  I was not a part of that committee, and I
16    don't recall -- I wasn't involved.
17    Q.  I'm not going to use the committee's name by
18    the right name.  I'm going to call it just the EEO
19    committee that you were a part of.
20        That committee, do you recall any other
21    members outside of yourself?
22    A.  Yes.
23    Q.  Who?
24    A.  Angela Thomas, Tracy Ladner, Ken Gunn.  There

Page 71

1    were others.  There was a representative from the
2    mayor's office for people with disabilities.  I'm
3    fairly certain there was somebody from human resources
4    in there, that would just have made sense, but I don't
5    recall any more names.
6    Q.  Was that sort of made up of department heads?
7    A.  No, it was not department heads.
8    Q.  Would an individual from each different
9    department from the City be part of this committee?
10    A.  No.
11    Q.  How often do you recall the committee
12    meeting?
13    A.  I don't recall.
14    Q.  You do recall being in a meeting though?
15    A.  Yes.
16    Q.  Do you recall being in more than one meeting?
17    A.  Yes.
18    Q.  Is it something that would be like an annual
19    meeting, or would it have more frequent meetings?
20    A.  I don't recall.
21    Q.  The topics of discussion at that committee
22    meeting, can you give me some topics that would be
23    discussed?
24    A.  They would have been issues regarding equal

Page 72

1    employment opportunity and diversity in the City.
2    That's what it would have been about.
3        I mean, I can't drill down any further than
4    that.  I don't remember.
5    Q.  When you would meet, what was the location of
6    the meeting?
7    A.  I don't recall.
8    Q.  It would be located within some type of City
9    facility, the DePaul Center, or City Hall, or
10    someplace like that?
11    A.  I believe so, but I don't know.  I just don't
12    recall.
13    Q.  At the time this was authored, do you recall
14    what Theresa's position was?
15    A.  I don't.
16    Q.  Does this sound like something you could have
17    asked her to do, get her input on this?
18        MR. PUGH:  Objection, speculation, lack of
19    foundation.
20        THE WITNESS:  I would not have asked her to
21    write this.  I may have asked her if there was some
22    work, but I don't recall doing so.
23    BY MR. BAKER:
24    Q.  Let's jump back into it then.

Page 73

1      A.   Okay.
2      Q.   We were in the second bullet point on the
3  last page of this exhibit.
4      A.   Presuming this was actually created in
5  December 2008, I disagree with the fourth bullet point
6  on the last page.  "...with whom DHR," I'm assuming
7  that means the department of human resources, "has
8  failed to execute any policies or programs to
9  safeguard hiring within the City," that is incorrect.
10  That's not just true.
11      Q.   When it says the federal hiring monitor, are
12  we talking about the Shakman monitor?
13      A.   I believe that's who she's referring to.
14      Q.   Let's jump down to the last.
15      A.   I disagree with the -- in the first
16  concluding paragraph, the first sentence, "In
17  addition, I would say that resources need to be
18  available for compliance to take over all EEO
19  investigations from the law department."
20      I don't necessarily disagree that compliance
21  should have done EEO investigations, but the law
22  department didn't do them at the time.  I don't think
23  they ever did.
24      Q.   So it's your understanding that the law

Page 74

1  department didn't do it, so that would be incorrect?
2      A.   Yes, it's just incorrect.
3      I disagree with the statement, "Law should be
4  involved on the litigation end."  In fact, I think
5  that is incredibly poor advice, and I would never
6  advise a client to only bring law in at the stage of
7  litigation.  That is, excuse my technical term, dumb.
8  You should bring your lawyers in before you have
9  litigation.  It just doesn't make any sense.
10      Okay.  That's it.
11      Q.   Thank you.
12      (Whereupon, Ward Deposition Exhibit
13      No. 3 was marked for
14      identification.)
15  BY MR. BAKER:
16      Q.   Mr. Ward, I've had marked as your Deposition
17  Exhibit Number 3 what was, I'll represent to you,
18  previously marked as Ms. Hill's Deposition Exhibit
19  Number 20.  And I'll also represent to you, that
20  that's my horrible handing in the box that says EX
21  Number 20.  So that we can just sort of do away with.
22      A.   That's fine.
23      Q.   Do you recognize this document at all?
24      A.   No.

Page 75

1      MS. BECKER:  Before we get into questions
2  about this document, I want to make a standing
3  objection.  The judge has limited this case to the
4  relevant period of 2002 to 2008.  We looked at a
5  document earlier dated 2010.  Now we're looking at
6  2009 documents.  So I'll object to the relevance of
7  all of this with respect to this lawsuit.
8      THE WITNESS:  No, I do not recognize this
9  document.
10  BY MR. BAKER:
11      Q.   Can we go through this sort of in the same
12  way that we went through the last document?
13      Just take peek at it, and if there's stuff
14  that sounds standards out to you as you disagree with
15  or is inaccurate.
16      A.   This is less of agreement than I don't
17  understand this document.  It start with non-funded
18  mandatory compliance programs.  I don't know what's
19  meant by non-funded.  Non-funded by who?  By the City?
20  By the State.  I don't know what she means by that.
21      These are not -- I mean, these are not
22  necessarily factual statements, so I'm not sure
23  whether -- I just don't know what she means by any of
24  this.  And because I don't know what's meant by

Page 76

1  non-funded, I just don't think I can say anything
2  about that.
3      As to ARRA compliance, American Recovery and
4  Reinvestment Act compliance, I don't know enough about
5  ARRA as I sit here today to make any kind of statement
6  about whether I agree or disagree with that, so I will
7  decline to say.
8      Q.   How about the last paragraph on Page 2 of
9  this document?
10      A.   I have no idea how much money the City
11  received in ARRA funds.  I just have no idea.  I just
12  don't know if that's true or not.  I don't know enough
13  about ARRA to know if that's true, or the City's use
14  of the ARRA funds.
15      Q.   Did you ever have any interaction at all with
16  mark Devan?
17      A.   Yes.
18      Q.   The interaction you had with Mr. Devan, was
19  that -- let me back up.
20      Did you work at some point in time in DHR?
21      A.   Near the end of my tenure with the City.
22      Q.   Is that when you had involvement with
23  Mr. Devan?
24      A.   No.

Page 77

1    Q.  Can you tell me what your involvement
2  without, obviously, going into attorney/client stuff?
3    A.  It was in my capacity as an attorney, and it
4  was regarding legal issues for the City.
5    Q.  Did it have anything to do with EEO?
6      Don't answer that.  That was a dumb question.
7  I apologize.  I'll strike my own question.
8          (Whereupon, Ward Deposition Exhibit
9          No. 4 was marked for
10         identification.)
11    MS. BECKER:  Before you start asking
12  questions about the exhibit, I'll just object to Ward
13  Exhibit 4 as being outside the scope of this
14  litigation.  It's a document from 2009, after the
15  lawsuit was filed.
16  BY MR. BAKER:
17    Q.  By the way, same thing goes.  This was
18  previously her Deposition Exhibit 19, and that's my
19  scribbling at the bottom.
20    A.  I understand.
21    Q.  Have you had an opportunity to look at this?
22    A.  Yes.
23    Q.  Do you recall these e-mails?
24    A.  I don't recall the e-mails, no.

Page 78

1    Q.  Is there any reason to doubt that these
2  aren't accurate e-mails that are copied here?
3    MR. PUGH:  Objection, lack of foundation.
4    THE WITNESS:  Without being rude, the only
5  reason I would doubt it is because Ms. Hill often
6  created documents which I have never seen based on
7  what I've seen in this deposition and others, but I
8  have no other reason to disbelieve that e-mail
9  exchange occurred.
10  BY MR. BAKER:
11    Q.  It looks like attached to this e-mail was a
12  summary, and there's the summary in these last two
13  pages.
14    A.  Yes.
15    Q.  Is it fair to say that you may have -- I
16  mean, was it part of your practice during this time
17  period to ask Theresa for comments on things like
18  this?
19    A.  Yes.  Theresa, at this time, was working in
20  my section.  She was, for lack of a better term, the
21  second highest ranking person in the division.  With
22  her background, I would at times ask her opinion.
23    I may have also asked someone else's opinion
24  about things, about information that we would

Page 79

1  distribute.
2    Q.  It looks like you're asking not just her but
3  somebody else.  I don't see that it's reflected who
4  else this may have been sent to.
5      At 11:40 a.m. it looks like you sent the
6  e-mail out with the attachment, and at 1:29 p.m. it
7  looks like there's a reply from Ms. Hill to you.
8      Do you agree or disagree with anything she
9  said in there?
10    MR. PUGH:  Objection, lack of foundation.
11    MS. BECKER:  Same objection.  Plus, to the
12  extent this will get into any kind of legal analysis,
13  I raise an objection with respect to attorney work
14  product.
15    THE WITNESS:  I don't know if her reply
16  e-mail at 1:29 p.m. is correct which -- yeah.  I don't
17  know if that's correct.
18  BY MR. BAKER:
19    Q.  When you say you're not sure if it's correct,
20  what in there do you have -- I don't know if you want
21  to call it a feeling, but there's something in there
22  that you're like --
23    A.  Well, I don't know if it's correct that the
24  City is a government contractor.  I don't know if

Page 80

1  that's true or not.  I'm not sure that there was a
2  need to have an implemented functional EEO/AAP plan,
3  which is a -- now, I can't answer this question
4  without -- I can't answer the rest of that question
5  without getting into legal analysis that I actually
6  performed for the City.  So, I'm sorry.
7    Q.  Do you know if it was a condition for the
8  receiving of funding?
9    MS. BECKER:  Same objections.
10    THE WITNESS:  That was a communication I
11  would have made to the clients, to answer that
12  question.
13  BY MR. BAKER:
14    Q.  Then it looks like above that you then shot
15  back to Theresa an e-mail where you're asking her for
16  a regulation or statute; is that fair?
17    A.  That's what it says, yes.
18    Q.  The DOL website, I take that to be the
19  Department of Labor website?
20    A.  I don't know if that's what she meant, but I
21  assume so.  I don't know if she was referring to
22  Illinois or federal.
23    Q.  Do you recall at all whether or not she sent
24  you any statute from a Department of Labor?

Page 81

1      A.  I don't remember.
2      Q.  In the attachment, do you have any reason to
3   doubt or to call into question the information that's
4   in the attachment?
5          MS. BECKER:  Object to the form of the
6   question.
7          THE WITNESS:  I don't remember who drafted
8   this, or if I drafted it, or where I got the
9   information from.
10         As I read through it, it does not appear to
11  be incorrect, but I don't have any reason --
12  particularly as to, let's say, the complaint
13  resolution, I have no reason to know whether that's
14  true or not.  But the other things like education
15  awareness and training, I mean, that's true.  I
16  believe the rest of it is true.
17             (Whereupon, Ward Deposition Exhibit
18              No. 5 was marked for
19              identification.)
20  BY MR. BAKER:
21     Q.  I've had marked as your Deposition Exhibit
22  Number 5 a group of e-mails, and I'll represent to you
23  that Counsel for the City and I went in front of
24  Judge Pallmeyer and we discussed what could be

Page 82

1   included and what could be redacted, so these are not
2   complete copies of the e-mails.  There are portions
3   that are redacted, okay?
4      A.  Yes.
5      Q.  Take your time and flip -- did you look at
6   these prior to your deposition beginning?
7      A.  I looked at Hill 204 only.
8      Q.  Only Hill 204?
9      A.  Yes.
10     Q.  Take some time and just look through these
11  then.
12     A.  Yes, sir.
13     Q.  Do you recall whether or not these e-mails
14  were sent and received on the dates indicated?
15         MS. BECKER:  I'm going to object.  Several of
16  these e-mails weren't sent or received by Mr. Ward, so
17  I think we need to go through -- I object to the form
18  of the question.
19         MR. PUGH:  Foundation.
20  BY MR. BAKER:
21     Q.  Let's go to the top page.
22     A.  I have no idea whether this document was sent
23  or received.
24         MR. BAKER:  I'll withdraw because I kind of

Page 83

1   agree with her, even though I'm on the other side.
2          THE WITNESS:  That's always good.
3   BY MR. BAKER:
4      Q.  Do you recall meeting with Theresa?
5          It looks like the initial e-mail says that "I
6   met with Torrick," and then there's some stuff that's
7   been redacted.
8          Do you recall that meeting?
9      A.  Yes.
10     Q.  You do?
11     A.  Yes.
12     Q.  The meeting that it's referring to here, was
13  that on or around June 4 of '07?
14     A.  I don't recall.
15     Q.  Skip Hill 204.
16         Would you go to the last page for me?
17     A.  Yes, I'm there.
18     Q.  In the middle of the page there's an e-mail
19  that has 11:02 a.m. on it.  It says, "The proposal
20  resubmitted to Brian Murphy in November can be
21  implemented.  We don't have to forfeit our grants.  I
22  can get the project jump started" --
23         MS. BECKER:  I think you mean second to last
24  page.

Page 84

1          MR. BAKER:  Did I say last page?
2          MR. PUGH:  Yes.
3          MR. BAKER:  I apologize.  Now it makes sense,
4   right?  I'm not reading from a blank page.
5          THE WITNESS:  You started in the middle of
6   the page?
7   BY MR. BAKER:
8      Q.  Right in the middle there.
9      A.  Yes.
10     Q.  At this time in 2007, where were you within
11  the City?
12     A.  I was an attorney in the law department.
13     Q.  And Brian Murphy, who is Brian Murphy?
14     A.  At the time, he, I believe, was the first
15  deputy chief of staff.
16     Q.  Do you know if there's anything -- do you
17  know, like, what this paragraph was sort of talking
18  about, something getting jump started?
19     A.  Yes, I do.
20     Q.  What does it bring up memory-wise for you?
21         MS. BECKER:  I'm going to object to the
22  extent Mr. Ward's answer would require him to divulge
23  attorney/client communications and it attorney work
24  product.

Page 85

1      THE WITNESS: It would involve disclosing
2  both, so I have to decline to answer the question.
3          (Whereupon, Ward Deposition Exhibit
4          No. 6 was marked for
5          identification.)
6  BY MR. BAKER:
7      Q. Mr. Ward, I have marked as your Group
8  Deposition Exhibit Number 6 a large binder clipped
9  packet which is Bates numbered City 1092 through City
10  1216. I'll just represent to you that I think
11  everything's consecutive in there. I didn't take
12  anything out, okay?
13      A. Okay.
14      Q. Have you ever seen these documents before?
15      MS. BECKER: I just want to make one
16  objection about the exhibit. On City 1092, it seems
17  to suggest that this is Page 12 of 13. So Pages 1
18  through 11 are not there. I just want to make that
19  note for the record.
20      MR. PUGH: Join in that objection.
21      THE WITNESS: I have seen City 1098. I can
22  state that.
23  BY MR. BAKER:
24      Q. I'm sorry. You were saying, Mr. Ward?

Page 86

1      A. I have seen City 1098 -- I'm sorry. That's
2  9, 1097, 1098. City 1103, 1104, 1105, 1106, 1107,
3  1108, 1109, 1110, 1111, 1112, 1113, 1114, 1115, 1116,
4  1117, 1118, 1119, 1120, 1121. I have seen 1215.
5      Q. I don't think your signature is after 1215.
6      A. As to the rest of the documents, I don't
7  recall seeing those that existed prior to May of 2010.
8      For the ones that existed after May 31, 2010,
9  I would not have seen those. I have no access to City
10  documents after that point.
11      MS. BECKER: Before we ask questions on Group
12  Exhibit Number 6, the City objects on relevance
13  because a number of these documents were created or
14  signed after 2008, after the lawsuit was filed, and
15  the judge has already ruled that those matters are not
16  material or relevant to the case.
17  BY MR. BAKER:
18      Q. Go to 1103, please.
19      A. Yes, sir.
20      Q. That's your signature --
21      A. Yes.
22      Q. -- at the bottom of the page. That's not
23  2011, that's 2010?
24      A. Yes.

Page 87

1      Q. I think I can speed this up a little bit.
2  1105 to 1121?
3      A. Yes.
4      Q. That is your signature and date on each one
5  of those documents from Pages 1105 to 1121?
6      A. Yes.
7      Q. Is it fair to say that these are EEO
8  certifications from Bates 1105 to 1121?
9      A. These are certifications that an EEOP is
10  required and on file.
11      Q. In some earlier questions and answers we
12  talked about a long form and a short form.
13      Are these certifications for either a long
14  form or short form; if you know?
15      A. No.
16      Q. What are they certifications for?
17      A. It is a certification that an EEOP is either
18  not required or that it is required and it's on file
19  with the organization.
20      Q. When it talks about it being on file, where
21  is it on file?
22      If I popped into City Hall back on the date
23  you certified this and I held this up, where would I
24  go to find this?

Page 88

1      A. The EEOP should say where it's on file.
2      Q. It says office of compliance, but, I mean,
3  office of compliance -- I take there's many, like,
4  offices and stuff.
5      MS. BECKER: Objection, foundation.
6  BY MR. BAKER:
7      Q. Is there a library, or is there a stack of --
8      A. Well, for instance, I'm going to refer to
9  1121. It says that it's on file at the --
10      Q. Hold on one second. I apologize. Go ahead.
11      A. It says that it's on file at the office of
12  compliance at 333 South State Street. That was one
13  office. I mean, you would walk up to the
14  receptionist.
15      Q. Let's pretend I'm back, 2010 I walk into the
16  office of compliance, hi, I'd like to see the EEO
17  that's on file. I take it that the receptionist -- I
18  mean, does she have it?
19      Or does she have to go to Mr. Boswell, who
20  gets it out of his desk drawer, or go to you? That's
21  kind of what I'm getting at.
22      MS. BECKER: Objection, form of the question,
23  foundation.
24      MR. PUGH: Join.

Page 89

1    THE WITNESS: You mean the EEOP?
2  BY MR. BAKER:
3    Q.  Yes.
4    A.  They would come to me.  I would pull it out.
5  I had a copy in my desk.  I would photocopy it for any
6  member of the public that wanted to see it and give it
7  to you.
8    Q.  So with that mind -- because these
9  certifications go from June of '08 until February
10  of 2010.  I think they're in chronological order.
11    During that time period, if it was required
12  that the EEOP be on file and it says that it's in the
13  office of compliance, is it fair to say that it was in
14  your desk?
15    A.  Yes.
16    Q.  During that time period?
17    A.  Yes.
18    Q.  So when you're certifying, the reason you can
19  certify is because it's in your desk?
20    A.  Well, in the file cabinet behind my desk,
21  yes.
22    Q.  Go to 1105.  In the last sentence it says,
23  "In addition to the above requirements."
24    Do you see that last little paragraph before

Page 90

1  you signed?
2    A.  Yes.
3    Q.  It talks about the authority.
4    What's your understanding of who the
5  authority is when it talks about authority?
6    MR. PUGH:  Objection, foundation.
7    THE WITNESS:  I don't recall.  I don't recall
8  who's meant by that.
9  BY MR. BAKER:
10    Q.  Go all the way to the back to Page 1214.
11    A.  Yes.
12    Q.  Again, that's your signature on that page,
13  too, correct?
14    A.  Yes.
15    Q.  Mr. Ward, there's also a received stamp.
16    Do you see --
17    A.  Yes.
18    Q.  When it says received, do you know who's
19  stamping it received?
20    A.  No.
21    Q.  It says, grants unit.
22    Are you aware of a grants unit with the City
23  of Chicago?
24    A.  Yes, there were multiple grants units in the

Page 91

1  City.
2    Q.  As you look at that stamp, you don't recall
3  which grants unit that would have been?
4    MS. BECKER:  Object to the form of the
5  question.
6    THE WITNESS:  I don't recall.  I don't even
7  know why that's there.
8  BY MR. BAKER:
9    Q.  Given that you don't know why it's there, you
10  wouldn't know why your certification on City 1214
11  would be stamped received by the grants unit but the
12  other signatures or the other certifications that we
13  looked at they don't appear to have a received stamp
14  on it?
15    MR. PUGH:  Objection, lack of foundation.  I
16  believe it misstates testimony, too.
17    THE WITNESS:  I don't really understand your
18  question.
19  BY MR. BAKER:
20    Q.  Earlier in one of your answers you said you
21  don't know why the grants stamp is there; is that
22  fair?
23    A.  Correct.
24    Q.  Given that you don't know why it's there,

Page 92

1  would you also not know why -- would you also not know
2  why it is absent from your prior certifications, City
3  1105 to 1121?
4    MR. PUGH:  Same objection with respect to
5  foundation, and I believe that it misstates his
6  testimony, too.
7    THE WITNESS:  So I don't know why on 1214
8  this stamp is there.  But I don't know when or how
9  these documents were kept in the intervening five
10  years, so I'm just not -- I don't know if I can say
11  why they're absent or not.
12  BY MR. BAKER:
13    Q.  That's what I'm looking for.
14    (Whereupon, Ward Deposition Exhibit
15    No. 7 was marked for
16    identification.)
17  BY MR. BAKER:
18    Q.  Mr. Ward, I've placed in front of you a group
19  document has been marked as your Deposition Exhibit
20  Number 7.  It was previously marked as Ms. Hill's
21  Exhibit Number 8.  And the same thing, that's my
22  scribble that says Exhibit 8 on it.
23    Have you ever seen this document before?
24    A.  I don't recall, but I may have seen an online

Page 93

1   version of it.
2       Q.  So you don't have any recollection as to
3   whether you may have used, in working in compliance,
4   the 7 Step Guide?
5           MS. BECKER:  Object to the form of that
6   question, but I'm going to object to the extent it
7   requires Mr. Ward to divulge attorney/client work
8   product -- or attorney work product.
9           MR. PUGH:  We would instruct the witness not
10  to answer with respect to if the answer will divulge
11  work product or privilege.
12          THE WITNESS:  Could you repeat your question,
13  sir?
14  BY MR. BAKER:
15      Q.  I just want to know if you've ever used this.
16      A.  Yes, I have used it.
17      Q.  Just to get a timeframe for when you used it,
18  you used it while you worked with the City?
19      A.  Yes.
20      Q.  In one capacity or another?
21      A.  Yes.
22      Q.  Jump back for a brief moment.  In your
23  Deposition Exhibit Number 6, can you go to Page 1104.
24      A.  Yes.

Page 94

1       Q.  Do you recognize that to be Mr. Boswell's
2   signature?
3       A.  Yes.
4           MR. PUGH:  Objection, lack of foundation.
5   BY MR. BAKER:
6       Q.  Can you go back to your Deposition Exhibit
7   Number 1, please?
8       A.  Yes.
9       Q.  Go to Page 508, City 508.
10      A.  Yes.
11      Q.  Do you recognize that to be Mr. Boswell's
12  signature?
13          MR. PUGH:  Same objection, lack of
14  foundation.
15          THE WITNESS:  Yes.
16          (Whereupon, Ward Deposition Exhibit
17              No. 8 was marked for
18              identification.)
19  BY MR. BAKER:
20      Q.  I want to know if this is the same.
21          MR. PUGH:  Objection that the document speaks
22  for itself.  If you can answer.
23  BY MR. BAKER:
24      Q.  One looks fuzzy, but it looks to have the

Page 95

1   same information on it but they're Bates stamped
2   different numbers.
3       A.  I understand your question, Mr. Baker.  I
4   would have to go through line by line to determine.
5       Q.  Let me try this way.
6           They appear, having looked at it page by
7   page -- without a specific analysis but a cursory
8   analysis, would it be fair to say that these documents
9   look to be the same?
10      A.  At risk of --
11          MR. PUGH:  Same objection.
12          THE WITNESS:  -- being argumentative, I don't
13  want to do a cursory analysis, because that's
14  basically a guess.
15          MR. PUGH:  That's not argumentative because
16  the attorney's not asked you to guess.
17  BY MR. BAKER:
18      Q.  Do you have an answer?
19      A.  Not without guessing.
20          MR. BAKER:  Let's mark the minutes.
21          (Whereupon, Ward Deposition Exhibit
22              No. 9 was marked for
23              identification.)
24

Page 96

1   BY MR. BAKER:
2       Q.  Mr. Ward, they've been marked previously as
3   City 68 and City 69.
4           Do you recognize what these are?
5       A.  Yes.
6       Q.  What are they?
7       A.  They appear to be meeting minutes from the
8   diversity committee.
9           MS. BECKER:  Before we get to questions, this
10  is a document dated 2010.  It's outside the scope of
11  the litigation.  It's a document created after the
12  lawsuit had already been filed.
13  BY MR. BAKER:
14      Q.  You and I discussed the diversity committee
15  and the meetings.
16          Would these be a copy of minutes from one of
17  those meetings?
18      A.  Yes.
19      Q.  Do you recall whether or not you attended
20  diversity committee meetings in 2008?
21      A.  I don't recall.
22      Q.  Do you know if it was called a diversity
23  committee in 2008?
24      A.  I don't recall.

Page 97

1    Q.  Do you recall when the diversity committee
2  actually took on the actual name diversity committee?
3    You mentioned it had been -- prior it had a
4  different name.
5    A.  Yeah.  I don't recall.
6    (Whereupon, Ward Deposition Exhibit
7    No. 10 was marked for
8    identification.)
9  BY MR. BAKER:
10    Q.  I have had marked as your Deposition Exhibit
11  Number 10 a document which is Bates stamped City 128
12  through 152.
13    Have you seen a copy of this before?
14    A.  Yes.
15    Q.  Where have you seen it?
16    A.  Multiple places, but I had a copy of this
17  document sometime in 2007.  I know I had a copy in
18  2007.
19    Q.  It mentions department personnel Jacqueline
20  P. King, Commissioner.
21    When you speak of having this document in
22  2007, is it your recollection that Ms. King was
23  commissioner in 2007?
24    A.  Yes.

Page 98

1    Q.  That is the time you were working in the law
2  department; is that correct?
3    A.  Yes.
4    Q.  Is this something that you kept, like, in
5  your file cabinet or your desk drawer?
6    A.  Yes.
7    Q.  We've talked about an EEOP plan.
8    Is this the EEOP plan?
9    A.  No.
10    Q.  So this is something different than what was
11  the EEOP that you were certifying that you mentioned
12  that you had in your file cabinet from one of the
13  prior exhibits?
14    Are you following my question or not?
15    A.  I do.  There's different timeframes.  The
16  EEOP I had was subsequent to this, which is later in
17  time.
18    The reason I had this in my desk is because I
19  used it in litigation, more than one case.
20    Q.  When you would certify that there was an
21  EEOP, I know you weren't -- those certifications don't
22  match this document, but is this an EEOP?
23    MR. PUGH:  Objection, vague.
24    MS. BECKER:  Same objection.

Page 99

1    THE WITNESS:  When you say this is an EEOP,
2  are you referring to the department of justice EEOP
3  required for Safe Streets Grants?
4  BY MR. BAKER:
5    Q.  Right.  In City 1105 through 1121 you had
6  signed off that you had -- the City had it on file, it
7  was in the department of compliance, and you mentioned
8  that you had it in your file cabinet.
9    This probably --
10    A.  No, I --
11    Q.  -- predates that, but I want to know, you
12  know, is this also an EEOP, or is an EEOP something
13  completely different than what this is?
14    A.  An EEOP is a different document.
15    Q.  What information is contained in the EEOP?
16    MS. BECKER:  I'm going to object to the form
17  of that question and the foundation of the question.
18    MR. PUGH:  Join.
19    THE WITNESS:  Can I refer you as an answer to
20  that question --
21  BY MR. BAKER:
22    Q.  To the 7 Step Plan?
23    A.  Yes.  That will answer it much better than I
24  can.

Page 100

1    Q.  I've got it.
2    A.  Yes.
3    Q.  So this talks about -- the 7 Step Guide is a
4  guide in seven steps as to how to develop a plan,
5  correct?
6    A.  Yes.  Your question, as I understood it, is
7  what is an EEOP.  On City 980, that question is
8  answered by the agency that requires it.
9    So instead of giving you an imperfect legal
10  opinion, I'm going to refer to the document.
11    Q.  Prior to your deposition beginning today, did
12  you look at an EEOP that was either a copy of or
13  similar to the one that you kept in your file cabinet?
14    A.  Yes.
15    MR. BAKER:  Do you have that?
16    THE WITNESS:  You showed it to me.  It's
17  Exhibit 1.
18  BY MR. BAKER:
19    Q.  That was called a short form though, correct?
20    A.  Yes.
21    Q.  Is there a difference between an EEOP and a
22  short form?  Like is there a full version and then the
23  short form is kind of like an abridged version?
24    A.  I believe you asked me that before.  There is

Page 101

1  a difference. I don't remember what the difference
2  is. That's it. I don't remember what the difference
3  is.
4      Q. So let me ask you this.
5      If I came back to you, you know, office of
6  compliance, back when you were in compliance, walked
7  up to the receptionist, said, hey, I want to get a
8  copy of the EEOP, and then you went -- you know, she
9  comes to you. You went to copy it.
10     Would you have given me a copy of the short
11 form or the actual full fledged EEOP?
12     MR. PUGH: Objection to the form. It also
13 seems to be based more on a hypothetical, not
14 referring to a specific time.
15     MS. BECKER: Same objections.
16     THE WITNESS: Those aren't different
17 documents.
18 BY MR. BAKER:
19     Q. The document that you had in your file
20 cabinet, was it the thing that we've looked at in
21 Exhibit 1, which is the short form?
22     A. Yes.
23     Q. If I came in and requested this thing back
24 then, that's what you would have given me a copy of?

Page 102

1      A. Yes.
2      MR. PUGH: Same objection.
3          (Whereupon, Ward Deposition Exhibit
4          No. 11 was marked for
5          identification.)
6  BY MR. BAKER:
7      Q. Mr. Ward, I've had marked as your Deposition
8  Exhibit Number 11 what's been previously Bates stamped
9  City 103 to City 127.
10     Have you seen this before?
11     A. I don't recall.
12         (Whereupon, Ward Deposition Exhibit
13         No. 12 was marked for
14         identification.)
15 BY MR. BAKER:
16     Q. I've had marked as your Deposition Exhibit
17 Number 12 what was previously marked as Ms. Hill's
18 Deposition Exhibit Number 9, a group of documents
19 Bates stamped City 70 through City 103.
20     MS. BECKER: Although, I'm concerned that
21 City 103 -- this might have just been skipped and City
22 103 is a different document.
23 BY MR. BAKER:
24     Q. For the record, the last Bates number is City

Page 103

1  102, and then there's Page 31 to that document which
2  does not have a Bates number on it, correct?
3      A. Correct.
4      Q. On the front page it says, "Affirmative
5  Action Plan 1995 to 1999."
6      Have you seen this before?
7      A. I don't recall.
8      Q. In the short form EEOP, what does the P stand
9  for?
10     A. I don't have independent recollection. I
11 literally would be guessing as I'm sitting here right
12 now without looking at the other documents.
13     Q. City department-wise, while you were in
14 compliance, was it compliance's role to guarantee that
15 the equal employment policies were being carried out
16 by other City departments?
17     MS. BECKER: Object to the form of the
18 question.
19     THE WITNESS: Not solely.
20 BY MR. BAKER:
21     Q. Who else shared that responsibility?
22     A. The mayor, all department heads, City
23 managers. All our documents state this is a shared
24 responsibility. Compliance had a meaningful role in

Page 104

1  it as well.
2      Q. The meaningful role that compliance had, was
3  it more along the lines of enforcement? Enforcement
4  might be too strong of a word.
5      A. I think the role would be investigation,
6  education, and data collection. But I should say,
7  even those responsibilities were shared with other
8  departments.
9      Q. Is it fair to say that the City was an EEO
10 employer?
11     MR. PUGH: Objection, vague.
12     THE WITNESS: To the extent that you're
13 saying that the City valued Equal Employment
14 Opportunity, yes, it was.
15 BY MR. BAKER:
16     Q. And that the City had to comply with federal
17 and state laws regarding Equal Employment Opportunity?
18     MS. BECKER: I'm going to object to the form
19 and to the foundation of that question. It's vague.
20     MR. PUGH: Join in those as well.
21     THE WITNESS: They had to comply with --
22 could you give me a little more information about what
23 they had to comply with that you're asking?
24

Page 105

1   BY MR. BAKER:
2       Q. Yeah, the EEO laws.
3       A. Title VII, 1983, is that what you're
4   referring to?
5       Q. Sure.
6       A. Yes, the City had to comply with the federal
7   statutes.
8       Q. Having talked a couple hours now about this,
9   do you recall who that outside contractor was?
10      A. No. Like I said, it was one of the big
11  accounting firms, but I just don't recall which one.
12      MR. BAKER: Thank you for answering my
13  questions. I appreciate it.
14      THE WITNESS: Thank you.
15      MR. PUGH: This is closed?
16      MR. BAKER: Of course it's closed.
17      MR. PUGH: I just want to state that the
18  reason why I ask is are you reserving questions that
19  need to be presented to the judge?
20      MR. BAKER: Oh, I mean, I might go to
21  Pallmeyer later on and say, you know, Mr. Ward, after
22  advice of the City and his counsel, declined to answer
23  these, yes.
24      MR. PUGH: So then it's essentially open to

Page 106

1   call Mr. Ward back. That's what I'm trying to figure
2   out.
3       MR. BAKER: Yes, but as far as, like, today
4   goes, outside of the judge ordering him to answer
5   questions, I don't have anything else.
6       MS. BECKER: The City has no questions.
7       THE WITNESS: Do you have an opinion about
8   whether I should waive or reserve?
9       MR. PUGH: You know what it means. Do you
10  want to review it?
11      THE WITNESS: Actually, because you're
12  keeping it open, I'll ask to review.
13      THE COURT REPORTER: Are you ordering?
14      MR. PUGH: Yes.
15      MS. BECKER: I'd like a copy, full.
16      THE COURT REPORTER: Do you need a copy?
17      MR. PUGH: I think the answer is no, unless
18  you tell me otherwise.
19      MS. BECKER: Mini as well.
20          (Witness excused.)
21
22
23
24

Page 107

1       UNITED STATES OF AMERICA    )
        NORTHERN DISTRICT OF ILLINOIS)
2       EASTERN DIVISION            )
        STATE OF ILLINOIS           )
3       COUNTY OF COOK              )
4           The within and foregoing deposition of
5   the witness, TORRICK WARD, was taken before Christine
6   Bechtold, C.S.R., Notary Public, in the City of
7   Chicago, County of Cook and State of Illinois and
8   there were present at the taking of said deposition
9   counsel as previously set forth.
10          The said witness was first duly sworn and
11  was then examined upon oral interrogatories. The
12  questions and answers were taken down in shorthand by
13  the undersigned and computer-transcribed under my
14  personal direction.
15          The within and foregoing is a true,
16  correct and complete record of all of the questions
17  asked of and answers made by the said witness at the
18  time and place hereinabove referred to.
19          The signature of the witness was not
20  waived and the deposition was submitted to the
21  deponent per copy of the attached letter. Pursuant to
22  Rule 30(e) of the Rules of Civil Procedure of the
23  United States District Courts, if the deponent does
24  not appear to read and sign the deposition within 28

Page 108

1   days or make other arrangements for reading and
2   signing, the deposition may be used as fully as though
3   signed, and this certificate will then evidence such
4   failure to appear as the reason for signature being
5   waived.
6           The undersigned is not interested in the
7   within case, nor of kin or counsel to any of the
8   parties.
9           Witness my official signature and seal as
10  Notary Public, in and for Cook County, Illinois, on
11  this 17th day of May, A.D., 2013.
12
13
14
15
16
17
18          _____
            Christine Bechtold
19          License No. 084-003575
20
21
22
23
24

Page 109

1          E R R A T A   S H E E T
2      I hereby make the following changes to my
3   deposition:
4   PAGE:      LINE:      CHANGE AND REASON
5   _____    _____    _____
6   _____    _____    _____
7   _____    _____    _____
8   _____    _____    _____
9   _____    _____    _____
10  _____    _____    _____
11  _____    _____    _____
12  _____    _____    _____
13  _____    _____    _____
14  _____    _____    _____
15  _____    _____    _____
16  _____    _____    _____
17  _____    _____    _____
18
19

    TORRICK WARD              DATE
20
21      Correction Sheet Pages      of
22
23
24