IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* THERESA HILL, ) ) ) | |
| Plaintiff, ) ) | |
| v. ) ) ) | No. 08 C 4540<br><br>Judge Rebecca R. Pallmeyer |
| CITY OF CHICAGO, ) ) ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Theresa Hill ("Hill"), a former Assistant Commissioner of Workplace Compliance for the City of Chicago ("City"), brought this *qui tam* action against the City under the False Claims Act, 31 U.S.C. §§ 3729-33 ("FCA"). Plaintiff claims that, in order to obtain federal grant money, the City filed certifications representing that it had an equal employment opportunity program that, in fact, did not exist. These allegedly false certifications in support of grant applications were made by the Chicago Police Department and the City's Department of Family and Support Services between 2002 and 2008. As a result, Plaintiff argues, any application that relied on the City's non-existent plan included a false statement designed to induce the fraudulent disbursement of federal funds in violation of the FCA. Following pretrial proceedings under seal, the United States declined to intervene [2] and the case was assigned to this court for adjudication of Plaintiff's individual claim. The City has moved for summary judgment, arguing that Hill has offered no evidence of any fraudulent conduct on the part of the City. For the reasons explained below, Defendant's motion for summary judgment [80] is granted.

## BACKGROUND

Under the FCA, a private individual may bring an action on behalf of the United States to recover funds that the government paid in reliance on a false statement. To understand the nature of Plaintiff's allegations under the Act, and the City's response, the court must first

describe the City's grant application and EEOP certification process. The City of Chicago relies on funding from grants to pay for vital services, such as law enforcement, that are not completely covered by local taxes or fees. (Pl.'s Concise Resp. to Def.'s 56.1 Statement [86], hereinafter "Pl.'s 56.1," ¶¶ 12, 21.) These grants, totaling approximately $1.4 billion annually, come from governmental as well as non-governmental organizations (not all of them identified in the record). (*Id.* ¶ 13.)

I.  **Equal Employment Opportunity Plan Certification**

This case involves a small subset of the grants applied for by the City and its departments between 2002 and 2008.[1] Specifically at issue are seventeen grants funded by the U.S. Department of Justice ("DOJ") under the Omnibus Crime Control and Safe Streets Act of 1968 ("OCCSSA"). 28 C.F.R. §§ 42.301-02. These grants were administered by the Illinois Criminal Justice Information Authority ("ICJIA") and awarded to two Chicago departments—the police department ("CPD") (eleven grants) and the Department of Family and Support Services ("DFSS")[2] (six grants). (Pl.'s 56.1 ¶ 23.) Pursuant to the OCCSSA, these grants required the applying entity to submit, for each application, a separate equal employment opportunity plan ("EEOP") certification verifying that the applicant has "formulated an Equal Employment Opportunity Plan in accordance with 28 C.F.R. §§ 42.301-08, that was signed into effect within the past two years by the proper authority and that it is available for review." (*Id.*) Under the relevant regulations, recipients of federal funding are "required to formulate, implement, and maintain an equal employment opportunity program relating to employment practices affecting minority persons and women within 120 days after . . . the initial application for assistance is

---

[1] The parties and the court have focused on these years because Plaintiff initiated this action in 2008 and the applicable statute of limitations is six years. 31 U.S.C. § 3731(b).

[2] Two of the seventeen applications at issue here were submitted by the Department of Children and Youth Services ("DCYS"), which later merged with the Department of Human Services ("DHS") to form the DFSS. (Def.'s Reply [87] at 2 n.1.)

approved." 28 C.F.R. § 42.302(d). The regulations further specify the characteristics of a satisfactory EEOP; for instance, it must be in writing and must include the number of persons employed by the grant applicant, identified by race, sex, and national origin; community labor characteristics such as population and existing unemployment figures by race, sex, and national origin; and "a detailed narrative statement setting forth the recipient's existing employment policies and practices[.]" 28 C.F.R. § 42.304.

Despite the language in these regulations, the City argues that an *active* EEOP was not a precondition for receiving these grants. This position is based on guidance that Larry Sachs, the Director of CPD's Research and Development Division (and a former grants research specialist) claims to have received (in some unspecified fashion) from the DOJ. In his declaration, Sachs expressed his belief that "if an EEOP has expired or a new EEOP has not yet been approved that [recipients] may continue to submit grant applications . . . and to receive . . . grant awards[.]" (Sachs Decl., Ex. D to Def.'s 56.1 [83], ¶ 7.) Plaintiff suggests, however, that this argument is inconsistent with City officials' insistence that EEOP certifications be submitted with grant application packets. (Pl.'s Resp. [85] at 9.) As further rebuttal of Sachs's position, Plaintiff notes that Gail Woods ("Woods"), a CPD grant specialist, told her that "[u]nless [the CPD applications included an EEOP certification], the CPD was not going to get grant money."[3] (Pl.'s 56.1 ¶ 97.) The court notes, however, that Woods's statement is not actually inconsistent with the position taken by Sachs and the City: namely, that although EEOP certification was required as part of the grant applications, the EEOP referenced in those certifications need not have been "active" to receive the funding. And, whatever the City's practice or policy may have been, a failure to adhere to that policy is not by itself a violation of federal regulations. As noted above, those regulations appear to require that grant applications

---

[3] Plaintiff did not depose Woods and relies instead on Hill's own deposition testimony regarding comments Woods allegedly made on unspecified dates in 2006 and 2007.

certify the existence of an EEO *plan* and that the grant applicant implement an EEO *program* 120 days after the application is approved.

## II. The City's Equal Employment Opportunity Plans

The City included an EEOP certification with each application it submitted for an ICJIA grant. Until late 2006, pursuant to the City's internal grant procedures, any department that had developed its own EEOP plan could submit an EEOP certification signed by officials from that department. (Hill Dep., Ex. A to Pl.'s 56.1, hereinafter "Hill Dep.," at 70:3-14.) Individual departments that completed grant applications but lacked their own EEOP plan could alternatively rely on the City's plan. In these instances, an official from the Office of Compliance or the Department of Human Resources ("DHR")—the departments responsible for promulgating the City's EEOP—could sign the certification. (*Id.*; Pl.'s 56.1 ¶ 34.) Starting in November 2006, however, all such certifications were to be signed by officials from the DHR. (E-mail from Woods to Devane of 06/04/07, Ex. 15 to Pl.'s 56.1.)

The seventeen grant applications at issue contained twenty-five certifications, which referred to three separate EEOPs: (1) the CPD's own EEOP; (2) the City's Equal Employment Opportunity/Affirmative Action Plan; and (3) the City's "Short Form" EEOP. (Def.'s Reply [87] at 1-2.) The parties agree that the CPD's EEOP and the City's "Short Form" EEOP satisfied the requirements of 28 C.F.R. §§ 42.301-08, but Plaintiff argues that the City's Equal Opportunity/Affirmative Action Plan was "non-performing." (Pl.'s Resp. at 7.) As a result, Hill argues, any application that relied on this plan included a false certification designed to induce the fraudulent disbursement of federal funds to the City in violation of the False Claims Act.

### A. Chicago Police Department's EEOP

The CPD has historically developed and maintained its own EEOP based on the DOJ's "Seven-Step Guide to the Design and Development of an EEOP." (Pl.'s 56.1 ¶ 25.) Since May 2002, CPD equal employment opportunity officer Robert Flores has led the CPD's ongoing

efforts to maintain its EEOP. (*Id.* ¶ 24.) Flores updated the CPD's EEOP in 2003, 2005, and 2007; and in each instance the CPD submitted the new plan for approval to the DOJ's Office of Civil Rights. (*Id.* ¶¶ 26, 28, 30.) Each update was approved shortly after its submission via a letter from the director of the Office of Civil Rights which stated that "the approved plan is effective for two years from [the date of the letter]." (*Id.* ¶¶ 27, 29, 31.) The most recent letter relevant to this litigation was dated November 1, 2007, approving the CPD EEOP through 2009. (*Id.* ¶ 31.)

### B. City of Chicago's Equal Employment Opportunity/Affirmative Action Plan

The DFSS, unlike the CPD, has never developed its own EEOP, choosing instead to rely on the City's plan, promulgated by the DHR in 2005. (*Id.* ¶ 34.) This plan, which the City (and, therefore, the DFSS) relied on from 2005 to 2008[4], was called the "Equal Employment Opportunity/Affirmative Action Plan" ("EEO/AAP"), and it aimed to "establish specific policies and procedures to promote employment opportunities for minorities and women in the workforce of the City." (Equal Employment Opportunity/Affirmative Action Plan, hereinafter "EEO/AAP," Ex. 11 to Pl.'s 56.1, at 4.) While Plaintiff does not deny that the EEO/AAP satisfies 28 C.F.R. §§ 42.301-08 on its face, she contends that the plan was "not functional or implemented." (Pl.'s 56.1 ¶ 34.) To support her assertion, Hill points to (1) inconsistencies between the hierarchy of the DHR and the oversight structure called for in the EEO/AAP; and (2) high-ranking City officials' limited familiarity with the EEO/AAP. (*Id.*) For instance, the EEO/AAP called for the "Commissioner of Personnel" to chair the "Equal Employment Opportunity/ Affirmative Action

---

[4] As noted, the CPD's EEOP (discussed above) was regularly updated. In contrast, there is no indication in the record that the EEO/AAP was ever updated after it was drafted in 2005. Significantly, however, none of the certifications that relied on the EEO/AAP appear to have been submitted more than two years after the plan was drafted in 2005. Thus, no certification appears to rely on a plan that was not "signed into effect within the past two years by the proper authority. . . . " (E.g., Equal Employment Opportunity Plan Certification of 4/21/06, Sachs Decl., Attachment 5.)

Advisory Council." (EEO/AAP at 7-9.) Yet the position of Commissioner of Personnel had not existed since 2000 when the Department of Personnel became the DHR. (Pl.'s 56.1 ¶ 35.) Further, Jacqueline King ("King"), the Commissioner of the DHR from 2005-2008 (King Dep., Ex. B to Pl.'s 56.1, at 8:2-7), who was ostensibly responsible for the implementation and monitoring of the EEO/AAP, testified that she is "not familiar" with either the Affirmative Action Advisory Council or the EEO/AAP plan itself. (King Dep. 13:11-20; 64:10-18.) Then-Deputy Commissioner Mark Devane ("Devane") assisted King with the DHR's EEOP efforts. (Pl.'s 56.1 ¶ 35.) Devane was also unfamiliar with the Advisory Council and he could not recall ever having read 28 C.F.R. §§ 42.301-08. (Devane Dep., Ex. C to Pl.'s 56.1, 48:12-14; 53:13-21.)

These concerns, the City urges, "elevate[] form over substance," because King and others were, in reality, promoting initiatives that were consistent with the EEO/AAP. (Def.'s Reply at 6.) For instance, the two main personnel practices identified by the EEO/AAP are "recruitment" and "selection" of under-represented groups in the City's work force. (EEO/AAP at 12.) King testified that her department worked in both of these areas to improve diversity in the City's departments, both externally ("[w]e targeted particular groups that we felt . . . were under-represented in the hiring process in the past to get more engaged in applying for jobs . . . .") and internally ("we worked with the city departments on a regular basis to make sure they are aware of the new policies [i.e., the targeting of under-represented groups in the hiring process] and, you know, make sure that they were in compliance . . . .") (King Dep. 70:22-72:4.) For her part, Plaintiff has not identified any particular hiring decisions or practices that cast doubt on King's assertions.

Further, although the Commissioner of Personnel position no longer exists, Defendant argues that King, who occupied the equivalent position in the DHR, carried out the role defined by the EEO/AAP. The EEO/AAP describes the responsibilities of the Commissioner of Personnel as follows: "[d]evelop policies and procedures to identify and remove unjustifiable or

6

discriminatory barriers to the employment and promotion of minorities and women." (EEO/AAP at 7.) Consistent with that job description, King testified that she and other DHR officials focused on improving employment opportunities for underrepresented minorities: "we were there to improve the hiring process and make sure that the process was open and everyone had access . . . our primary goal was to remove [discriminatory] barriers." (King Dep. at 70:22-71:10.) Also, another DHR employee, Torrick Ward ("Ward")[5], testified that he had participated in an "Executive Diversity Committee," which was preceded by the "Affirmative Action Committee or something like that." (Ward Dep., Ex. D to Pl.'s 56.1, at 68:18-70:10.) Ward recalled the names of several members of the committee, remembered that it met several times[6], and explained that it focused on "issues regarding equal employment opportunity and diversity in the City." (Ward Dep. at 70:17-72:4.) While the committee titles Ward cited are not identical to the phrasing in the EEO/AAP (Affirmative Action Advisory Council v. Affirmative Action Committee), Defendant argues that "the subject matter intended to be covered by the committees was the same." (Def.'s Reply at 7.)

### C. City of Chicago's EEOP Short Form

In 2007, the City's Office of Compliance also created another city-wide EEOP called the "EEOP Short Form" ("short form"), which replaced the City's EEO/AAP. This plan was effective for a two-year period from January 1, 2008 through December 31, 2009. (Pl.'s 56.1 ¶ 36.) The parties agree that this plan satisfied the requirements of 28 C.F.R. §§ 42.301-08. (*Id.*)

### III. Grant Applications and Equal Employment Opportunity Certifications

As noted, the seventeen federal grants at issue include a total of twenty-five EEOP

---

[5] Prior to working for the DHR, Ward served as an attorney in the City's law department. (Def.'s Resp. to Pl.'s AMF [88] ¶ 82.)

[6] Ward did not mention, nor was he asked at his deposition, when these meetings occurred.

certifications signed by various city officials. Nine of these certifications relied on the disputed EEO/AAP, while thirteen relied on the CPD plan, and three others relied on the short form EEOP.

### A. Chicago Police Department's Grant Applications

The CPD's Research and Development Division is responsible for the police department's grant procurement. (*Id.* ¶ 38.) Between 2002 and 2008, the Research and Development Division submitted eleven grant applications for ICJIA funds that included eighteen EEOP certifications. (*Id.* ¶¶ 43-46, 48-52, 55-59.)

Thirteen of the eighteen certifications relied on the CPD's own EEOP, which was reviewed and approved by the DOJ.[7] Neither party disputes that the CPD's EEOP was on file and available for review at the time in the CPD's Office of Legal Affairs at 3510 South Michigan Avenue. (*Id.* ¶¶ 26-32, 43-45, 48-51, 56-57.) Of the remaining five certifications, two relied on the City's EEOP Short Form.[8] (*Id.* ¶¶ 58-59.) The other three relied on the City's EEO/AAP: Mark Devane signed two and Tariq Malhance signed one.[9] (*Id.* ¶¶ 46, 52, 55.) The certification signed on October 12, 2005 by Malhance, the City's former Comptroller, stated (and the parties agree) that the City had an EEOP on file and available for review at the Department of Personnel at 333 South State Street, Suite 330. According to Malhance's declaration,

---

[7] These thirteen EEOP certifications were part of the following grant applications: 601007 (two EEOP certifications, submitted in 2004); 600207 (two, submitted in 2005); 602007 (one, submitted in 2005); 403800 (two, submitted in 2006); 503026 (one, submitted in 2006); 104052 (two, submitted in 2006); 602107 (one, submitted in 2006); 403703 (one, submitted in 2007); 106052 (one, submitted in 2008). (Pl.'s 56.1 ¶¶ 43-45, 48-51, 56-57.)

[8] These certifications were part of applications for grants number 106052 and 505026 (both submitted in 2008). (Pl.'s 56.1 ¶¶ 58-59.)

[9] Devane served as signatory for certifications relying on the City's 2005-2009 Plan as part of applications for grants 602107 and 504026 (submitted in 2006 and 2007, respectively); Malhance signed a certification for grant 602007 (submitted in 2005). (*Id.* ¶¶ 46, 52, 55.)

8

Malhance believed the certification to be true at the time he signed it, and had no intention of submitting an inaccurate or false certification. (*Id.* ¶¶ 46-47.) The final two certifications, signed by Devane in 2006 and 2007, certified that the City had an EEOP on file at the DHR at 333 South State Street, Suite 330. Devane does not recall signing either of these certifications, but he denies ever making any representations he knew to be false or with the intent to defraud. (*Id.* ¶¶ 52-55.)

The City does not explain why the CPD, which had its own EEOP, would rely on the City's plan for these certifications, but Hill testified that Woods (the CPD's grant specialist) told her the CPD was relying on the City's plan because the department's own EEOP was "inactive." (*Id.* ¶ 8.) Neither Hill nor the City deposed Woods, and Hill does not specify exactly where, when, or how (e.g., in person or via e-mail) Woods made this statement to her. For its part, the City neither confirms nor denies that Woods made the statement, choosing instead to argue that Woods's comments constitute inadmissible hearsay (discussed below). The court notes, however, that Woods's alleged comments appear to be at odds with the undisputed fact that the CPD's EEOP was updated in May 2005 and, therefore, was valid and active in 2006 when Woods approached Hill. (*Id.* ¶¶ 28-31.) The court suspects that the exchange between Woods and Hill may instead have been a comment on the 2006 policy change explained in a June 2007 e-mail between Woods and Devane that required all EEOP certifications starting in fall 2006 to go through the DHR's office. (E-mail from Woods to Devane of 06/04/07, Ex. 15 to Pl.'s 56.1.)

**B.      Department of Family and Support Services' Grant Applications**

Between 2002 and 2008, the DFSS and its predecessors (the Department of Children and Youth Services ("DCYS") and the Department of Human Services ("DHS")) filed seven EEOP certifications as part of six grant applications (*id.* ¶¶ 62-63, 65-70, 72); six of the seven

relied on the City's EEO/AAP (the other relied on the City's short form EEOP[10]). Three of these six certifications were signed by Loisteen Woods Walker ("Walker"), the DHS's Director of Administration, in June 2006, April 2007, and July 2007, respectively.[11] (*Id.* ¶ 62, 67-69.) Each of the certifications signed by Walker stated that the City's EEOP was on file at 1615 West Chicago Avenue. At that time, Walker did have a copy of the City's EEO/AAP in her office at that address. (*Id.* ¶¶ 62-64, 67-69.) Another certification, signed by then-commissioner Sheryl McGill ("McGill") on June 12, 2006, identifies the same EEOP and filing location as those signed by Walker.[12] (*Id.* ¶ 65.) McGill believed the City's EEO/AAP complied with federal requirements and would not have signed it otherwise. (*Id.* ¶ 66.) One certification, signed by then-commissioner Mary Ellen Caron on September 6, 2006, certified that DCYS had an EEOP on file in the DHR at 121 North LaSalle Street.[13] (Caron Decl., Tab K to Def.'s 56.1, ¶ 5.) Caron believed this statement to be true and was aware that the DHR, which was then located at 121 North LaSalle Street, had developed the City's EEO/AAP. (Pl.'s 56.1 ¶¶ 70-71.) The seventh EEOP certification, signed by Devane, stated that the City had an EEOP on file in the DHR at 333 South State Street, Suite 330.[14] The parties agree that the City had an EEOP on file at the DHR at that time. (*Id.*) As with his certifications for the CPD, Devane does not recall signing

---

[10] This certification was included in the application for grant 206389. (Pl.'s 56.1 ¶ 69.)

[11] These certifications were included in applications for grants 205289, 206289, and 205389. (Pl.'s 56.1 ¶¶ 62-64, 67-68.)

[12] This certification was included in the application for grant 205289. (Pl.'s 56.1 ¶ 65.)

[13] This certification was included in the application for grant 2006-JU-FX-K012. (Pl.'s 56.1 ¶ 70.)

[14] Defendant cites to this certification for Grant No. 105072 by its Bates number (City 1681) but does not provide its location in the lengthy record in this case. (Pl.'s 56.1 ¶ 72.) The court has been unable to locate the certification or the date it was signed, but the parties do not dispute its contents.

this certification, but he denies ever making any representations that he knew to be false or with the intent to defraud. (*Id.* ¶ 72.)

## IV.  Hill's Involvement with Grant Applications

Plaintiff Theresa Hill began working for the City of Chicago as an Assistant Commissioner in the Workplace Compliance Unit ("WCU") of the DHR in October 2006. (*Id.* ¶ 5.) Hill's responsibilities at DHR included overseeing matters related to drug testing, sexual harassment, and labor relations, as well as EEO issues. (Hill Dep. at 118:3-20; 126:2-10.) Shortly after Hill joined the DHR,[15] Robert Keller ("Keller"), the department's equal employment opportunity officer, asked Plaintiff to contact Gail Woods about signing an EEOP certification for a federal grant application prepared by the CPD. (*Id.* ¶ 7.) According to Plaintiff, Woods told Hill that the CPD's affirmative action plan was "inactive" and, in order to be eligible for funding, the CPD needed to substitute the City's plan until the CPD could "get their plan back together." (Hill Dep. at 69:17-70:1.)

Before signing the certification, Hill decided to do more research regarding the City's purported plan. (Pl.'s 56.1 ¶ 9.) As part of this effort, Plaintiff obtained a copy of the City's EEO/AAP and searched for evidence that it had actually been "implemented." (*Id.* ¶ 9.) Hill did not, however, read the regulations referred to in the EEOP certifications. (Hill Dep. at 104:8-12.) After examining personnel payroll and other documentation in search of evidence that the City had made efforts to implement its plan, Plaintiff concluded that the plan had not, in fact, been implemented by the City (Plaintiff did not offer any additional details regarding either the methodology or findings of her research into the implementation of the purported plan, nor did she identify with greater particularity the records or other circumstances that led her to believe it was not implemented). (Pl.'s 56.1 ¶ 9.) Based on this belief, Plaintiff refused to sign the EEOP

---

[15]  Neither party identified the date on which Hill was first asked to sign an EEOP certification.

11

certification. Hill testified that she was asked to sign "at least six or seven certifications in 2006," but did not provide documentation for any 2006 requests other than Woods's. (Hill Dep. at 121:12-16.) She declined to sign every certification, and it is undisputed that she was never ordered or required to do so by her superiors. (Pl.'s 56.1 ¶ 9.)

Several months later, Hill again refused to sign another CPD EEOP certification forwarded to her via e-mail by Devane. (*Id.* ¶ 98.) On June 4, 2007, in addition to declining to sign the certification, Hill e-mailed then-Commissioner of the DHR, Jacqueline King, raising concerns about the EEOP implementation. (*Id.* ¶¶ 10, 99.) Plaintiff claims that King later acknowledged that the City has an EEOP "on paper only." (Compl. [1] ¶ 14.) Plaintiff has not explained when or how King made this concession, nor does she clarify whether it was in person or via e-mail. For her part, King acknowledges discussing the subject with Hill; however, King says that she was never personally sure whether Hill's concerns about the EEO/AAP were accurate, but that she "trusted [Hill]" and told Hill to "never sign anything you are not comfortable with." (King Dep. at 75:10-21, 76:20-77:10.) King also testified that she brought Hill's concerns to other City officials, including members of the legal department, although she could not recall the names of these individuals. (*Id.* at 75:24-76:4.)

King also advised Plaintiff to contact the City's legal department about the issue. (Pl.'s 56.1 ¶ 11.) In response, Hill contacted Torrick Ward and Amy Kovolan ("Kovolan"), two attorneys then employed in the City's law department, in person and via e-mail about the City's EEOP. (*Id.* ¶¶ 99, 102.) Subsequent e-mails between Plaintiff, Ward, and Kovolan in the record are heavily redacted, as the City has invoked the attorney-client privilege as to these communications. (Ex. 17 to Pl.'s 56.1.) It is undisputed, however, that Kovolan wrote in a June 11, 2007 e-mail to Plaintiff that the Mayor's office had asked the law department to "explore having the required work done on behalf of the City"; the first step of which was to "complete the study" and then "execute the plan." (*Id.* ¶ 101.) Plaintiff did not depose Kovolan, nor does she

12

offer any additional explanation or context for these comments, but she argues that they corroborate her assertions regarding the status of the City's EEO/AAP. (*Id.*) Through her correspondence with the law department officials, Plaintiff came to believe that no City employee was to sign off on any EEOP certifications until the City could ensure it was compliant with 28 C.F.R. §§ 42.301-08. Hill herself never signed off on any of the certifications brought to her, nor does it appear that any City official signed any EEOP certification from the time Hill raised her objections until the City's new EEOP Short Form was adopted in 2008. (Pl.'s 56.1 ¶ 11.)

## DISCUSSION

### I. Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). In other words, a court may grant summary judgment "when the pleadings and submissions in the record indicate the absence of any genuine issues of material fact, so that the moving parties are entitled to judgment as a matter of law." *U.S. ex rel. Yannacopoulos v. Gen. Dynamics*, 652 F.3d 818, 823 (7th Cir. 2011) (citing *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1317 (7th Cir. 1995)). As the non-moving party, Hill is entitled to the benefit of any reasonable inferences in her favor that are supported by the record. (*Id.*) (citing *Jakubiec v. Cities Service Co.*, 844 F.2d 470, 471 (7th Cir. 1988)).

### II. False Claims Act

Hill brings this *qui tam* action under the False Claims Act. *Qui tam* suits have been part of the FCA's scheme for preventing fraud against the federal government since the Civil War. Under that scheme, a private citizen with personal knowledge of such fraudulent activity may bring suit on behalf of the government in return for a share of the proceeds, should the suit prevail. *United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1016 (7th Cir. 1999).

Any such proceeds are calculated based on the defendants' liability, which, under the FCA, amounts to three times the sum of ill-gotten funds, plus a civil penalty. 31 U.S.C. § 3729. Where, as here, the government chooses not to intervene, the relator's cut is between twenty-five and thirty percent[16] of the proceeds of a successful action, in addition to reasonable expenses and attorneys' fees, all of which are awarded against the defendant. 31 U.S.C. § 3730(d)(2).

To establish civil liability under the False Claims Act ("FCA"), a relator generally must prove (1) that the defendant made a statement in order to receive money from the government; (2) that the statement was false; and (3) that the defendant knew the statement was false. 31 U.S.C. § 3729(a)(2); *United States ex rel. Yannacopoulos*, 652 F.3d at 822. Regarding the knowledge requirement, the defendant must have acted with "actual knowledge," "deliberate ignorance," or "reckless disregard" to the possibility that the submitted claim was false. 31 U.S.C. § 3729(a)(1)(A), (b). To survive a motion to dismiss, Relators must "identify specific false claims for payment or specific false statements made in order to obtain payment." *United States ex rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374, 376 (7th Cir. 2003). Further, an FCA claim premised upon an alleged false certification of compliance with statutory or regulatory requirements also requires that the certification of compliance be a condition of or prerequisite to government payment. *United States ex rel. Gross v. Aids Research Alliance-Chicago*, 415 F.3d 601, 604 (7th Cir. 2005) (citing cases from other circuits). The FCA is not, however, "an appropriate vehicle for policing technical compliance with administrative regulations." *Lamers*, 168 F.3d at 1019-20.

---

[16] The exact percentage is determined by the court based on what is "an amount which . . . is reasonable." 31 U.S.C. § 3730(d)(2). Where the government does intervene, the private citizen may receive between fifteen and twenty-five percent. 31 U.S.C. § 3730(d)(1).

### A. EEOP Certifications as Prerequisite for Government Funding

Plaintiff argues that a certification that the City had an "active" EEOP was a precondition for receiving federal funds via the ICJIA. (Pl.'s Resp. at 8-10.) Defendant counters that an active EEOP was not, in fact, a precondition for these moneys. Rather, the City points to the declaration of Larry Sachs, Director of the CPD's Research and Development Division, who, based on his interactions with the DOJ and the ICJIA, testified that grant applications may be accepted even if a recipient's EEOP is "inactive." (Sachs Decl. ¶ 7.) The City also argues that Plaintiff has not offered any admissible evidence to rebut Sachs's position and show that certification of an "active" EEOP was actually a condition of funding. (Def.'s Reply at 2-4.) Thus, Defendant argues, the City is entitled to summary judgment, as even false EEOP certifications could not give rise to FCA liability where those certifications were not prerequisites for federal grant funding. (*Id.*)

The only support Plaintiff offers for her position is indeed hearsay—statements allegedly made by Woods to Hill in 2007. The evidence is admissible in the sense that it is an admission by the agent of a party opponent, as Woods, a City employee, was speaking to Hill about a matter within the scope of her employment, namely, grant applications. FED. R. EVID. 801(d)(2)(D). But Woods's statement is a statement of law, not of fact. Woods's interpretation of federal requirements is not controlling as a matter of law. That is, the court will not declare the City to be out of compliance with a legal standard merely because any particular City official believes it is.

Unfortunately, the regulations cited in the EEOP certifications themselves provide little clarity as to whether an "active" EEOP was a precondition to funding. On the one hand, they define "noncompliance" as "[f]ailure to implement and maintain an [EEOP]," suggesting that an "active" plan was required to receive funding. On the other hand, the regulations elsewhere allow recipients a 120-day buffer from the date their application is accepted in which to

15

"formulate" and "implement" an EEOP, 28 C.F.R. § 42.302(d), which corroborates the position held by Mr. Sachs and the City. Based on both the actions of City officials and the text of the relevant regulations, it is unclear whether an "active" EEOP was truly a prerequisite for these grants. For the purposes of this opinion, however, the court will assume that an "active" EEOP was a condition of payment for the grants involved here.

### B.     FCA Liability for Grant Applications Relying on the City's EEO/AAP

Of the twenty-five EEOP certifications signed by City officials between 2002 and 2008, only the ten that relied on the City's EEO/AAP are at issue here, as the CPD and short form EEOPs undisputedly comply with the relevant regulations. That is, the certifications that relied on the CPD and short form EEOPs were not "false" under the FCA.

Regarding the ten certifications that relied on the City's EEO/AAP, Plaintiff argues that they violate the FCA because the plan existed "on paper only." (Pl.'s Resp. at 7.) That is, the EEO/AAP "perform[ed] no function other than to be used to obtain federal funding, and, therefore, the certifications indicating otherwise were false statements designed to obtain federal dollars. It is a non-performing plan, i.e., ineffective, existing in name only." (*Id.*) Assuming that an "implemented" EEO/AAP was required in order to receive grant funding, Plaintiff still must show that (1) the certifications here were false (i.e., that the EEO/AAP was *not* implemented in compliance with 28 C.F.R. §§ 301-08); and (2) the City prepared the false certifications "knowingly."

Plaintiff insists that the EEO/AAP was not properly "implemented," citing three types of evidence. First, Hill argues that the City itself has acknowledged that its EEO/AAP was a sham. On this score, Hill relies largely on language in the City's memorandum in support of summary judgment, and characterizes that language as an admission that the EEO/AAP was non-functional. She asserts that, "[f]or purposes of its summary judgment motion, the City assumes that it did not have a properly functioning plan." (*Id.*) Notably, Plaintiff does not cite to any

16

portion of Defendant's memorandum in support of this assertion, and the court is unable to find any indication that the City has made any such concession. To the contrary, the City's memorandum argues that the City is entitled to summary judgment even *if* the court finds that the EEO/AAP was non-functional. For instance, regarding the certification signed by Malhance, the City argued that (1) the certification did not violate 28 C.F.R. §§ 42.301-08; and (2) if it did, the City still did not violate the FCA because it made no willful false statements:

> Relator has not and cannot dispute the fact that the City's . . . EEO/AAP, which had been developed by DHR, was in existence at the time, and that DHR [was located at the address in the certification.] Further, although Relator may claim that that document did not satisfy the EEOP Certification requirements, because it was allegedly not being fully implemented, any such error . . . would not rise to the level of a false statement . . . Moreover, there is no evidence . . . that Malhance acted with deliberate ignorance or reckless disregard . . . .

(Def.'s Mem. at 12-13.) As the court reads this language, it presents an alternative basis for summary judgment in favor of the city—not an admission, even for purposes of its summary judgment motion, that the EEO/AAP was inadequate or somehow not properly implemented.

Second, Hill makes a number of arguments regarding the non-"implementation" of the EEOP, but these efforts amount to little more than formalism. For instance, Plaintiff highlights formalistic inconsistencies between the structure of the City's actual equal employment opportunity bureaucracy and the one outlined in the EEO/AAP. (Pl.'s 56.1 at 3.) She also emphasizes the limited knowledge that EEOP certification signatories have of the EEO/AAP and of 42 C.F.R. §§ 42.301-08. (*Id.* at 3, 13-14.) The record indicates, however, that Defendant was actually following the guidance provided by the EEO/AAP by (1) marketing job vacancies to those groups that were underrepresented in the City's workforce; (2) internally prioritizing the hiring of individuals from these underrepresented groups; and (3) establishing committees to monitor the progress of the City's equal employment opportunity initiative. Plaintiff has offered no evidence to the contrary, nor has she even attempted to substantively attack the City's efforts to carry out its plan (which she acknowledges is adequate on paper) as inadequate

17

under the requirements laid out in 28 C.F.R. §§ 42.301-08. While King and Devane were disappointingly uninformed about the City's affirmative action plans and relevant federal regulations, Plaintiff ignores the deposition testimony and declarations of other City officials, such as Ward, who displayed command of the City's EEOP. Ward's familiarity evinces the City's efforts to implement its EEOP throughout the relevant period.

Third, and finally, Plaintiff supports her contention that the EEO/AAP was not "implemented" with her own deposition testimony recalling conversations she had with Woods and King. Woods's alleged statements are immaterial, however, insofar as they refer to the CPD's EEOP rather than the City's. This leaves only Hill's assertion that King had agreed that the City's plan existed "on paper only." Even taken in the light most favorable to Hill, this testimony alone does not create a genuine issue for trial. Hill's deposition testimony is contradicted by both King's own deposition testimony as well as the testimony of Ward and others who indicated that the plan was, in fact, in action. In conjunction with Hill's failure to offer any specific evidence that indicates that the EEO/AAP violates relevant regulations, Hill's unsupported testimony is insufficient to defeat a motion for summary judgment. Although summary judgment must be denied where the parties simply aver to competing versions of events, *Lujan v. Natl'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990), the non-moving party is still required to present evidence that "meets the usual requirements for evidence presented on summary judgment—including the requirements that it . . . set forth specific facts showing that there is a genuine issue for trial[.]" *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003). Hill has failed to do so here.

The City's EEO/AAP was, in fact, implemented in accordance with 28 C.F.R. §§ 42.301-08. The City's EEOP certifications that relied on the EEO/AAP, therefore, did not contain a false statement required to establish FCA liability. Accordingly, Defendant is entitled to judgment as a matter of law.

Finally, because the statements in the City's EEOP certifications were not false, they could not have been "knowingly" false as required to trigger FCA liability. Thus, the court need not explore this element of Plaintiff's FCA claim.

## CONCLUSION

Defendants' motion for summary judgment [80] is granted.

ENTER:

Dated: January 14, 2013

_____
REBECCA R. PALLMEYER
United States District Judge